1  KENNETH DEREK ANTHONY PILLAY
   587 Middlebury Drive
2  Sunnyvale, California 94087-1319
   Telephone: (408)674-4484
3  Email: ken@pillay.com

**FILED**

4  Plaintiff

5  MAY 2 0 2009

6  RICHARD W. WIEKING
   CLERK, U.S. DISTRICT COURT
7  NORTHERN DISTRICT OF CALIFORNIA

8  **UNITED STATES DISTRICT COURT**
   for the
9  **NORTHERN DISTRICT OF CALIFORNIA**

**MHP**

10  CV 09  2226

| | |
|---|---|
| 11  KENNETH DEREK ANTHONY PILLAY, | CIVIL Action No.: |
| 12       Plaintiff, | |
| 13       v. | Document Number: 1 |
| 14  CISCO SYSTEMS, INC., | **COMPLAINT** |
| 15  Additional Defendants in the ADDITIONAL | DEMAND FOR JURY TRIAL |
| 16  DEFENDANTS ATTACHMENT TO | |
| 17  COMPLAINT, and | Case Management Judge: |
| 18  DOES 1 through 100, inclusive, | Division: San          , California |
| 19       Defendants. | |

20

21  Plaintiff alleges:

22  ## PARTIES

23  1.  Defendant CISCO SYSTEMS, INC. ("CISCO") is a corporation # C1183477

24      incorporated under the laws of the State of California ("California") in the United States

25      ("U.S.") with its principal place of business in the County of Santa Clara in the Northern

26      District of California in the U.S..

27  2.  Defendants "Additional Defendants" are named persons or entities listed in the

28      ADDITIONAL DEFENDANTS ATTACHMENT TO COMPLAINT.

3.   Defendants DOES 1 through 100 are currently fictitious persons or entities whose real identities will be disclosed and substituted in an Amended Complaint as and when they are fully discovered or ascertained.

4.   Plaintiff KENNETH DEREK ANTHONY PILLAY is a U.S. person residing in the County of Santa Clara in the Northern District of California inside the U.S.. Plaintiff's national origin is outside the U.S.; Seychelles at birth. Plaintiff naturalized as a U.S. citizen inside the U.S. in the year 2003.

## VENUE, JURISDICTION, and INTRA-DISTRICT ASSIGNMENT REQUEST

5.   The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

6.   Based on the currently disclosed parties, the U.S. District Court for the Northern District of California ("Court") appears to be the proper venue for this action ("Federal Action") pursuant to the laws of the U.S..

7.   This Court has jurisdiction for this Federal Action pursuant to 28 U.S.C. § 1331 (federal question), 1343(a)(1) (civil rights injury) and possibly other Federal statutes.

8.   Even though most of the parties in this Federal Action appear to be located in the County of Santa Clara in California, which by default would direct this case to be assigned to the San Jose division of this Court, Plaintiff hereby requests for this case to be intra-district assigned to a U.S. District Judge in the San Francisco division of this Court, for any and all matters or proceedings pertaining to the trial and disposition of this Federal Action. The San Francisco division of this Court currently has active cases that are assigned to the Honorable Chief Judge VAUGHN R. WALKER pertaining to allegations of unlawful electronic surveillance and therefore coordination of this Federal Action with those other active cases in the San Francisco division of this Court may conserve resources and may promote an efficient determination of this Federal Action.

## INTRODUCTION

9.   The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

PILLAY v. CISCO SYSTEMS, INC. et alia   **COMPLAINT**                                                    Page 2

1    10. This Federal Action comes before this Court arising from alleged violations by

2         Defendants in themselves or via their current or former directors, officers, employees,

3         agents, assigns or affiliated companies against Plaintiff of certain amendments of the U.S.

4         Constitution and the laws of the U.S.. The alleged violations include commit or aid, abet,

5         counsel, command, induce unlawful electronic surveillance and unreasonable searches on

6         Plaintiff's communications, unlawful interception or disclosure of Plaintiff's information

7         or records pertaining to Plaintiff's communications, deprivation or conspiracy to deprive

8         or neglect to prevent deprivation of Plaintiff in rights or privileges, abridgement of

9         Plaintiff's freedom of communications, and abridgement of Plaintiff's privileges and

10        immunities. As a result of the alleged violations against Plaintiff, Plaintiff has been

11        injured in property and in person and henceforth seeks redress via this Court. Plaintiff

12        also presents other potential causes of action pertaining to alleged potential unfair or

13        deceptive acts or practices in or affecting commerce or labor at CISCO, for this Court's

14        review and adjudication or referral to other appropriate U.S. authorities which may have

15        further jurisdiction over those matters.

16   11. Background that may be relevant to the alleged violations in this Federal Action include

17        Plaintiff's response in a dissolution of marriage ("divorce") action, attorney fee dispute

18        between a divorce attorney and Plaintiff, Plaintiff's employment at CISCO, stock options

19        held by CISCO on behalf of Plaintiff, Plaintiff's response to an attorney fee dispute

20        action brought by a divorce attorney against Plaintiff while Plaintiff was at CISCO,

21        Plaintiff's attempts at propounding civil discovery on CISCO during the attorney fee

22        dispute action, and Plaintiff's pursuit to secure his rights, privileges and immunities under

23        the protection of the U.S. Constitution, the laws of the U.S. and the laws of the State of

24        California.

## BACKGROUND ON PROCEEDINGS IN THE DIVORCE ACTION
## LEADING UP TO AND INCLUDING THE CHILD CUSTODY TRIAL

27   12. The allegations set forth in the preceding paragraphs are re-alleged and incorporated

28        herein by reference as if set forth fully herein.

PILLAY v. CISCO SYSTEMS, INC. et alia    **COMPLAINT**                                    Page 3

13. On or about October 3, 2002 Plaintiff became the respondent ("Plaintiff/respondent") in a divorce action in case number 1-02-FL-109410 ("Divorce Action") in the Superior Court of the County of Santa Clara in the State of California ("California Trial Court"). The papers to start the Divorce Action were filed in that California Trial Court via Mr. THOMAS ELWOOD BOUMAN, a divorce attorney having the California bar number 122937, who is the attorney of record for the petitioner in the Divorce Action. On or about October 15, 2002 Plaintiff/respondent sought the assistance of Mr. ROBERT JOSEPH TENNANT, a divorce attorney having the California bar number 36656, to assist Plaintiff/respondent in responding in the Divorce Action.

14. In the bundle of forms and declarations that were filed ex-parte at the start of the Divorce Action, in one of the declarations it was alleged in pertinent part that Plaintiff/respondent was from a "[s]mall third world countr[y]" and as a result an alleged flight risk. It is alleged by the petitioner in the Divorce Action that Mr. BOUMAN, attorney of record for the petitioner, wrote that depiction of Plaintiff/respondent's country of national origin. In that declaration it was also alleged in pertinent part that Plaintiff/respondent "[s]pends most of the day at his place of employmen[t]".

15. The Divorce Action was assigned to Department 76 of that California Trial Court presided in then by the Right Honorable Judge DOLORES ANN CARR. Former judge CARR is now the District Attorney for the County of Santa Clara in California. The initial ex-parte applications for order that were requested by Mr. BOUMAN and approved by former judge CARR resulted in a California Law Enforcement Telecommunications Systems ("CLETS") Temporary Restraining Order ("TRO"), among other relief, being unfavorably granted against Plaintiff/respondent. Plaintiff/respondent was served the CLETS TRO on October 9, 2002 and as a result Plaintiff/respondent was immediately denied access to the divorce parties' three children with no visitation to Plaintiff, Plaintiff was denied access to the divorce parties' family residence, and denied access to bank accounts, until a pendente-lite hearing set for October 30, 2002.

16. On October 10, 2002, one day after Plaintiff/respondent was served the CLETS TRO, the petitioner's parents travelled from the United Kingdom ("UK") and moved into the divorce parties' family residence in Sunnyvale, California. A few days prior to the filing of the Divorce Action the petitioner had asked Plaintiff/respondent if the divorce parties could pay the petitioner's parents' airfares to enable them to visit the divorce parties and the divorce parties' three children in Sunnyvale, California during Christmas (in the month of December) 2002, and Plaintiff/respondent had agreed. Petitioner, with Mr. BOUMAN's involvement, misled Plaintiff/respondent on the intended timing of the petitioner's parents' move to the divorce parties' family residence in Sunnyvale, California.

17. Mr. TENNANT did not request a Child Custody Emergency Screening from that California Trial Court, which appears to be a procedure that could have been requested from that court before the pendente-lite hearing in the Divorce Action, wherein Plaintiff/respondent could have immediately contested that court's instant denial of Plaintiff/respondent's access to the divorce parties' three children.

18. In *Palmore v. Sidoti*, 466 U.S.429 (1984) Chief Justice BURGER delivered the opinion for a unanimous court which opined in pertinent part at page 434 that "[T]he effects of racial prejudice, however real, cannot justify a racial classification removing an infant child from the custody of its mother found to be an appropriate person to have such custody[.]". If one substitutes the term "racial" with "national origin", and substitutes the term "mother" with "parent" in this quote, Plaintiff argues that the immediate denial of Plaintiff/respondent's access to the divorce parties' three children with no visitation to Plaintiff/respondent was unjustified because there was no proof that Plaintiff/respondent was not an appropriate person to have custody of the divorce parties' three children. Plaintiff/respondent together with the petitioner had been jointly raising the divorce parties' three children in the family residence prior to the start of the Divorce Action.

19. The manner in which Mr. BOUMAN initially filed the Divorce Action, i.e. via filing ex-parte and requesting a CLETS TRO against Plaintiff/respondent, and based on any bias or

prejudice Mr. BOUMAN may have against Plaintiff/respondent's national origin, severely prejudiced the Divorce Action in favor of the petitioner and against Plaintiff/respondent, and created a basis for unjustified and protracted contested child custody litigation which in turn caused undue financial burden on the divorce parties and more so on Plaintiff/respondent.

20. Plaintiff/respondent responded in the Divorce Action by filing a Responsive Declaration therein requesting that California Trial Court to award to Plaintiff/respondent and the petitioner, and as to each of them, joint legal custody and joint physical child custody with 50% timeshare of the divorce parties' three children, fundamental rights that Plaintiff/respondent believes the divorce parties' three children should have.

21. The pendente-lite hearing for the Divorce Action was held on October 30, 2002 in Department 72 of that California Trial Court presided in then by the Honorable Judge KATHLEEN LOUISE LUCERO. At that pendente-lite hearing the CLETS TRO against Plaintiff/respondent expired and was not renewed, Plaintiff/respondent was awarded joint legal custody and joint physical child custody but with only approximately 20% timeshare of the divorce parties' three children, and the bank accounts remained blocked. An Employment Efforts Order ("EEO") was issued against the petitioner. Prior to the Divorce Action there existed an unresolved dispute between the divorce parties whereby Plaintiff/respondent had been requesting the petitioner to seek paid employment to support herself and help support the divorce parties' three children, but the petitioner had blatantly refused to do so on an ongoing basis since the year 1996; the EEO being issued to the petitioner was therefore an ironic twist arising from the petitioner's initiating of the Divorce Action.

22. After the pendente-lite hearing Plaintiff/respondent sought Mr. TENNANT's assistance to continue to request that California Trial Court to award to Plaintiff/respondent and the petitioner, and as to each of them, joint physical child custody with 50% timeshare of the divorce parties' three children, and also to promptly obtain a judgment in the Divorce Action.

23. At the time the Divorce Action was started, Plaintiff/respondent worked at CISCO as a senior manager of engineering in software development. After the pendente-lite hearing the bank accounts were still blocked via the applications for order that were requested by Mr. BOUMAN and approved by former judge CARR at the start of the Divorce Action, and the funds that Plaintiff/respondent had access to were his wage from CISCO and stock options (deferred potential assets if the stock options are vested and above-water) held by CISCO on behalf of Plaintiff/respondent. During the Divorce Action, Plaintiff/respondent paid spousal support and child support to the petitioner, and had to set up a new residence for the children and him. The divorce attorneys, Mr. BOUMAN and Mr. TENNANT, availed of various disbursements from the blocked bank accounts to pay themselves. In addition, Plaintiff/respondent paid Mr. TENNANT from his wage from CISCO and proceeds from exercise of vested and above-water stock options held by CISCO on behalf of Plaintiff/respondent.

24. Following protracted proceedings in the Divorce Action, on May 28, 2004 a Child Custody Trial was held in Department 71 of that California Trial Court presided in then by the Honorable Judge JAMES PAUL KLEINBERG. The outcome at that trial was a judicially supervised settlement presided by Judge KLEINBERG wherein Plaintiff/respondent and petitioner, and as to each of them, were awarded joint physical child custody with 50% timeshare of the divorce parties' three children, with both parents becoming equal physical custodians of the divorce parties' three children.

25. On May 3, 2005 the California Assembly rejected bill number AB-1307, a bill sponsored by Assemblyperson MERVYN M. DYMALLY, which appears to have proposed a presumption of "equal contact" (50% timeshare) physical child custody in divorce cases but unfortunately that bill was defeated in a 8 to 1 vote by that California legislature. Had that bill passed, perhaps much of the contested physical child custody litigation which occurs during a divorce action with minor children could be avoided.

26. In the California Supreme Court decision in *In re marriage of Burgess* (1996) 13 Cal.4th 25 ("*Burgess*") it was decided that "[a] custodial parent seeking to relocate bears no

burden of establishing that the move is "necessary" to do s[o]". That decision in *Burgess* was adopted as California Family Code § 7501(b).

27. In the County of Santa Clara in California, and possibly in other counties in other States in the U.S., if a parent is awarded physical child custody with 57% or more timeshare that parent is designated the "custodial", or also sometimes called the "primary", parent. Pursuant to the *Burgess* decision, a custodial parent could petition the court for a move-away order to change the residence of a child even though the non-custodial parent had physical child custody with up to 43% timeshare of that child.

28. When Mr. BOUMAN, attorney of record for the petitioner, filed the papers at the start of the Divorce Action he somehow conveniently failed to inform that California Trial Court that the petitioner was not a U.S. citizen at that time and given that the petitioner was a UK citizen, the petitioner in herself might well become a "legalized" flight risk given that Mr. BOUMAN had requested on behalf of the petitioner sole legal custody and sole physical child custody to petitioner with no visitation to Plaintiff, and for the passports, of the divorce parties' three children.

## BACKGROUND ON PROCEEDINGS IN THE DIVORCE ACTION
## AFTER THE CHILD CUSTODY TRIAL

29. The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

30. Following the Child Custody Trial, Plaintiff/respondent and Mr. TENNANT started preparing for a Property Trial towards Plaintiff/respondent's goal of obtaining a judgment in the Divorce Action. That Property Trial was held on March 28 and 29, 2005 in Department 71 of that California Trial Court presided in then by the Honorable Judge MARCEL BELMAR POCHÉ. However at the end of that trial the matters from that trial were not submitted to that court for adjudication because the Custodian of Records of MICROSOFT CORPORATION ("MICROSOFT") had failed to appear at that trial and produce business records as had been requested in a CIVIL SUBPOENA (DUCES TECUM) FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS

AND THINGS AT TRIAL OR HEARING AND DECLARATION that Mr. TENNANT had issued to MICROSOFT on or about March 1, 2005 prior to that trial.

31. After that Property Trial, on or about April 20, 2005 Mr. TENNANT filed an ORDER TO SHOW CAUSE ("OSC") in that California Trial Court to compel MICROSOFT to produce the business records that had been requested in the subpoena issued to MICROSOFT on or about March 1, 2005. On April 25, 2005 Judge POCHÉ granted Mr. TENNANT's requested order in that OSC whereby MICROSOFT was ordered to produce the requested business records not later than May 15, 2005. MICROSOFT produced a CD-ROM labeled "MS/SUB 0099" ("CD-ROM") to Mr. TENNANT. Plaintiff/respondent requested that CD-ROM from Mr. TENNANT but Mr. TENNANT did not provide that CD-ROM to Plaintiff/respondent. Mr. TENNANT's office staff examined that CD-ROM and following which Mr. TENNANT requested intervention of that California Trial Court alleging that CD-ROM contained records that may be privileged to the "petitioner". Mr. TENNANT was supposed to be assisting Plaintiff/respondent. Given that Mr. TENNANT's office staff, who are third parties, had examined the records on that CD-ROM, Plaintiff/respondent questioned whether there would still be valid claim that some of the records on that CD-ROM would still be privileged to any party. Can a bell be un-rung?

32. After deliberations and proceedings involving the divorce attorneys, Mr. TENNANT and Mr. BOUMAN, and subsequently Judge POCHÉ's intervention, Judge POCHÉ directed Mr. TENNANT to provide that CD-ROM to Mr. BOUMAN, attorney of record for the petitioner, and requested Mr. BOUMAN to review the records on that CD-ROM and produce records that would not be privileged to the petitioner in the Divorce Action to Plaintiff/respondent. Plaintiff/respondent had requested an in-camera review of any records on that CD-ROM that Mr. TENNANT or Mr. BOUMAN alleged were privileged to the petitioner, but that court unfortunately did not grant Plaintiff/respondent's request for an in-camera review of those documents. Plaintiff/respondent also argued that if there were claims of privilege on records of communications between the petitioner and Mr.

PILLAY v. CISCO SYSTEMS, INC. et alia    **COMPLAINT**    Page 9

BOUMAN, the attorney of record for the petitioner, and that if any other third parties were included in those communications then those records of communications should not be privileged to the petitioner.

33. One of the records on that CD-ROM that Mr. BOUMAN provided to Plaintiff/respondent was a printout of an email that appears to have been sent from Mr. KENNETH E. HALL to the petitioner in the Divorce Action. Mr. HALL, paid tax preparer identification number (PTIN #) P00287601, is at the firm DEATON, MICHAELS & HALL whose address is 987 University Avenue, Suite #22, Los Gatos, California 95032-7640. Plaintiff/respondent argued that if there were records between Mr. BOUMAN, Mr. HALL and the petitioner on that CD-ROM then those records should not be privileged to the petitioner since Mr. HALL is a third party. Sometime later in or about the month of September 2005, Plaintiff/respondent discovered that Mr. HALL had prepared, signed and filed U.S. and California tax returns for the taxable year 2003 using Plaintiff/respondent's taxpayer identification number and claiming capital losses from a brokerage financial account that was held solely in Plaintiff/respondent's name. Access to that CDROM may provide further clarification of Mr. HALL's involvement.

34. Plaintiff/respondent questioned whether there was sufficient independent review and adjudication when Mr. BOUMAN, the divorce attorney for the petitioner, also acted in the capacity of a discovery master or referee to determine which of the records on that CD-ROM would be privileged to his represented party (the petitioner) and not be released to the opposing party (Plaintiff/respondent) in the Divorce Action.

35. Mr. BOUMAN subsequently deposited that CD-ROM in Department 71 of that California Trial Court and that court should still have possession of that CD-ROM. MICROSOFT should also have a copy of the data set "MS/SUB 0099" that was burnt on that CD-ROM.

36. Following the MICROSOFT MS/SUB 0099 CD-ROM "hot potato" saga, it appears Mr. TENNANT began taking steps to withdraw from the Divorce Action. The open issue though was that Mr. TENNANT alleged attorney fee arrears. Mr. TENNANT was not

willing to submit the undecided matters arising from the Property Trial held on March 28 and 29, 2005 to that California Trial Court for adjudication, which had included the issue of attorneys' fees and costs.

37. Instead Mr. TENNANT requested Plaintiff/respondent to exercise vested, unexpired and above-water stock options held by CISCO on behalf of Plaintiff/respondent and pay Mr. TENNANT whatever amount Mr. TENNANT demanded. Plaintiff/respondent declined stating to Mr. TENNANT that the issue regarding attorneys' fees, costs and sanctions arising from the Property Trial held on March 28 and 29, 2005 had not been adjudicated on by that California Trial Court and therefore that Mr. TENNANT should instead request that court to adjudicate on the undecided matters from that Property Trial to enable the divorce parties to obtain a judgment in the Divorce Action. Mr. TENNANT declined Plaintiff/respondent's request.

38. In Plaintiff/respondent's trial brief for that Property Trial held on March 28 and 29, 2005, Plaintiff/respondent had also requested for that court to rule on Plaintiff/respondent's request for sanctions against Mr. BOUMAN due to Mr. BOUMAN's relentless personal attacks against Plaintiff/respondent, and due to Mr. BOUMAN's denigration of Plaintiff/respondent, and due to Mr. BOUMAN continuous creation and elevation of conflict, during the Divorce Action. The Honorable Judge JAMES PAUL KLEINBERG presiding then in Department 71 of that California Trial Court had issued an Order on March 4, 2004, which ironically was drafted by Mr. BOUMAN himself, which provided in pertinent part that "[T]he Court reserves jurisdiction over the issue of attorneys' fees, costs and sanctions until time of trial[.]". Neither Mr. TENNANT nor Mr. BOUMAN, the divorce attorneys, submitted to that California Trial Court the undecided matters from the Property Trial held on March 28 and 29, 2005 for adjudication by that court, and to date more than five (5) years later after that trial the matter regarding sanctions against Mr. BOUMAN still remains undecided, in addition to other undecided matters arising from that trial.

39. On February 15, 2006 Mr. TENNANT withdrew from the Divorce Action, alleging attorney fee arrears.

40. On information and belief, sometime after February 15, 2006 Mr. TENNANT began pressuring CISCO who held stock options on behalf of Plaintiff/respondent to attempt to claim by force or coercion payment for alleged attorney fee arrears. Mr. TENNANT was very familiar with Plaintiff/respondent's financial situation during the Divorce Action, and that with the bank accounts having been blocked via the applications for order that were requested by Mr. BOUMAN and approved by former judge CARR at the start of the Divorce Action, and with Plaintiff/respondent having already made substantial payments in excess of U.S. $ 130,000.00 to Mr. TENNANT during the Divorce Action, and with Plaintiff/respondent having accrued debt during the Divorce Action, and with Plaintiff/respondent then having only his wage from CISCO, the only other source of potential funds that Plaintiff/respondent could have had access to would have been the vested, unexercised, unexpired and above-water stock options held by CISCO on behalf of Plaintiff/respondent.

## BACKGROUND ON THE TENNANT ATTORNEY FEE ACTION

41. The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

42. On August 27, 2007 Mr. TENNANT brought an action against Plaintiff while Plaintiff worked at CISCO. Plaintiff became the defendant ("Plaintiff/defendant") in that action in case number 1-07-CV-093007 ("Tennant Action") in that California Trial Court, wherein Mr. TENNANT alleged that Plaintiff/defendant had breached a written contract that Mr. TENNANT alleged existed between Mr. TENNANT and Plaintiff/defendant.

43. On September 24, 2007 Plaintiff/defendant responded in the Tennant Action by filing an ANSWER-Contract denying Mr. TENNANT's claim that a written contract existed between Mr. TENNANT and Plaintiff/defendant, and that as a result Plaintiff/defendant did not breach any such written contract between Mr. TENNANT and Plaintiff/defendant.

44. On information and belief, at that point Defendants capitulated to pressure that Mr.
TENNANT had been exerting on CISCO in Mr. TENNANT's quest to claim by force or
coercion payment for alleged attorney fee arrears. Mr. TENNANT had listed "DOES 1
TO 10" as other Defendants in the Tennant Action. The Tennant Action was an action
between Mr. TENNANT, a divorce attorney, and one other person (Plaintiff/respondent)
in a divorce action.

45. On or about October 3, 2007 CISCO presented Plaintiff with an unconscionable
unsigned document titled SEPARATION AGREEMENT AND GENERAL RELEASE
dated October 3, 2007 ("Cisco Separation Agreement") in which it was stated in pertinent
part that "[Y]ou are being provided thirty (30) days to consider this Agreement * * *
Your scheduled final day of employment with Cisco is 30 calendar days from the date
you receive this Agreement * * * you release Cisco, any affiliated companies, and the
current and former officers, directors, agents, employees and assigns of Cisco and any
affiliated companies, to the maximum extent permitted by law, from any and all known
and unknown claims up through the date that you execute this Agreement, and you agree
your final date of employment shall be the date that you sign this Agreemen[t]".

46. CISCO did not provide any reason or cause for presenting Plaintiff with that
unconscionable Cisco Separation Agreement. There were no mass lay-offs going on at
that time at CISCO either. Plaintiff declined to sign that unconscionable Cisco Separation
Agreement that CISCO attempted to coerce Plaintiff into signing.

47. On or about November 9, 2007 CISCO presented Plaintiff with another unsigned
document dated November 9, 2007 in which it was stated in pertinent part that "[T]his
letter is being presented to you to address the final terms of your transition from Cisco
Systems, Inc. (Cisco). Your last day of employment will be November 9th, 2007[.]".

48. Again, CISCO did not provide any reason or cause for presenting Plaintiff with that
second unsigned document. At that time, Plaintiff was the defendant in the Tennant
Action in that California Trial Court defending himself against Mr. TENNANT's
allegations, and Plaintiff had not succumbed to Mr. TENNANT's forceful and coercive

demands that Plaintiff should exercise the vested, unexpired and above-water stock options held by CISCO on behalf of Plaintiff/respondent, and Plaintiff was the ongoing respondent in the Divorce Action.

49. CISCO stopped paying Plaintiff without cause on or about November 7, 2007 and CISCO disabled Plaintiff's access to the CISCO Building 24 where Plaintiff worked in Milpitas, California. As a result of those forceful or coercive acts, Plaintiff was injured in property. Plaintiff was deprived in property in not being able to hold onto vested, unexercised, unexpired and above-water stock options, which had been granted to Plaintiff by CISCO, until the expiry dates of those stock options. Further, Plaintiff was deprived in property in not being able to continue to hold onto vested, unexpired and under-water stock options which had been granted to Plaintiff by CISCO, until the expiry dates of those stock options. Further, Plaintiff was deprived in property in not being able to continue to vest stock options which had not vested and not expired yet, which had been granted to Plaintiff by CISCO, until the expiry dates of those stock options.

## BACKGROUND ON PLAINTIFF'S ATTEMPTS AT PROPOUNDING CIVIL DISCOVERY ON CISCO DURING THE TENNANT ATTORNEY FEE ACTION

50. The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

51. Given the timing of the start of the Tennant Action on August 27, 2007, and given the steps taken by CISCO shortly thereafter presenting to Plaintiff without reason or cause two (2) unsigned documents back to back, and CISCO not giving any reason or cause as to why CISCO stopped paying Plaintiff on or about November 7, 2007, Plaintiff/defendant in the Tennant Action attempted to propound civil discovery to obtain business records from CISCO.

52. On information and belief, sometime after February 15, 2006 Plaintiff's communications started to be interfered with at Plaintiff's workplace at CISCO in Milpitas, California and at Plaintiff's residence in Sunnyvale, California.

53. On April 30, 2008 Plaintiff/defendant issued, via that California Trial Court because Plaintiff/defendant appeared in propria persona in that court, to the Custodian of Records of CISCO a deposition subpoena for production of business records directing CISCO to produce business records to Plaintiff/defendant at 10:00 A.M. on May 22, 2008 ("First Cisco Records Subpoena"). CISCO's response to that First Cisco Records Subpoena was a letter dated May 19, 2008 from CISCO's outside counsel, the law firm MORGAN LEWIS & BOCKIUS, LLP ("MORGAN LEWIS"), which stated in pertinent part that "[C]isco will not respond to this Subpoena until the Court has issued a ruling in this matter[.]". CISCO's outright and blanket objection to that First Cisco Records Subpoena and soliciting immediate court intervention was unjustified because Plaintiff/defendant had worked at CISCO for 10+ years and CISCO had records pertaining to the Plaintiff/defendant that should have been produced to Plaintiff/defendant. If CISCO had any concerns as to the scope of that First Cisco Records Subpoena then CISCO should have at least produced records pertaining to Plaintiff/defendant and sought court intervention for any other records that may be argued to be privileged to other persons.

54. The civil discovery laws provide that a valid objection to a subpoena has to be executed via a Motion to Quash filed with the court. Neither CISCO nor MORGAN LEWIS nor Mr. TENNANT filed with that California Trial Court a Motion to Quash Plaintiff/defendant's First Cisco Records Subpoena. That First Cisco Records Subpoena expired at 10:00 A.M. on May 22, 2008 and CISCO did not produce any of the records requested in that deposition subpoena to Plaintiff/defendant.

55. On May 22, 2008 Plaintiff/defendant filed a Motion to Enforce the First Cisco Records Subpoena. A hearing on that motion was scheduled on the Discovery Calendar of that California Trial Court which was assigned to Department 7 of that California Trial Court presided in by the Right Honorable Judge SOCRATES PETER MANOUKIAN. That hearing was later re-assigned to Judge POCHÉ, with Judge POCHÉ that time presiding in Department 6 of that California Trial Court.

56. That hearing was held on June 20, 2008 presided by Judge POCHÉ and at that hearing Plaintiff/defendant stated to Judge POCHÉ that "[T]he (Cisco) stock options only realize value when they are exercised. * * * I (Plaintiff/defendant) believe plaintiff (Mr. Tennant) has a keen desire to get his hands on my stock options. And I'd like to try and find out under what circumstances did he believe that he would be able to secure that[.]". Judge POCHÉ's response was "[Y]ou're allowed to do that, but you still haven't given me any reason at all how these personnel records of other people are going to help you prove your case[.]". Judge POCHÉ had commented regarding disclosure of records pertaining to persons other than Plaintiff/defendant, but Judge POCHÉ also stated that Plaintiff/defendant was "allowed" to discover and obtain records pertaining to Plaintiff/defendant from CISCO. CISCO had not produced any records in response to Plaintiff/defendant's First Cisco Records Subpoena. At the end of that hearing Judge POCHÉ denied Plaintiff/defendant's Motion to Enforce the First Cisco Records Subpoena, but without prejudice.

57. On July 21, 2008 Plaintiff/defendant issued to the Custodian of Records of CISCO a second deposition subpoena for production of business records, that time limiting the scope of that deposition subpoena for production of business records to take into account Judge POCHÉ's comment expressed earlier at the hearing conducted on June 20, 2008, and directing CISCO to produce business records to Plaintiff/defendant by 10.00 A.M. on August 14, 2008 ("Second Cisco Records Subpoena"). That Second Cisco Records Subpoena requested: "a. Copies of any and all writings, available in paper or electronic format, including letters, email headers, email content, facsimile transmissions, and any other evidence of correspondence, in the custody and control of Cisco Systems Inc., from/to Robert Joseph Tennant (email address bob@rjtennant.com) and/or Michelle Brenot (email address michelle@rjtennant.com) , to/from any and all persons or agents of Cisco Systems Inc., from February 16, 2006 to April 29, 2008, regarding Kenneth Derek Anthony Pillay." and "b. Copies of any and all logs of telephone calls, available in paper or electronic format, in the custody and control of Cisco Systems Inc., from/to Robert

Joseph Tennant (telephone number (408)857-4890 or (408)866-4292) and/or Michelle Brenot (telephone number (408)891-9622 or (408)866-4292), to/from any and all persons and agents of Cisco Systems Inc., from February 16, 2006 to April 29, 2008. Where known, the Custodian of Records of Cisco Systems Inc. shall also provide the names for any and all persons and agents of Cisco Systems Inc. whose telephone numbers show up in the telephone logs, for any and all telephone calls from/to Robert Joseph Tennant and/or Michelle Brenot.".

58. Neither CISCO nor MORGAN LEWIS nor Mr. TENNANT responded to that Second Cisco Records Subpoena on or before its expiry date at 10:00 A.M. on August 14, 2008. CISCO again did not produce any records in response to Plaintiff/defendant's Second Cisco Records Subpoena.

59. On August 19, 2008 Plaintiff/defendant caused to be filed a Motion to Enforce that Second Cisco Records Subpoena. The hearing on that motion was set for September 12, 2008 in Department 7 of that California Trial Court presided in by Judge MANOUKIAN. That California Trial Court then maintained a "sandbox" discovery calendar whereby all discovery disputes in all unlimited jurisdiction cases in that court were assigned to one department, and as a result one judge, for review and adjudication. At that time, the discovery calendar was assigned to Department 7 of that California Trial Court and as a result Judge MANOUKIAN presiding in Department 7 of that California Trial Court was designated to usually hear all discovery disputes in all unlimited jurisdiction cases in that court.

60. In Plaintiff/defendant's pleading filed with that court on August 19, 2008 for Plaintiff/defendant's Motion to Enforce the Second Cisco Records Subpoena, Plaintiff/defendant quoted an extract from the second amended opinion in *United States v. Forrester*, United States Court of Appeals for the Ninth Circuit ("U.S. Court of Appeals 9th"), Case No. 05-50410, ORDER AMENDING OPINION AND DENYING PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC AND AMENDED OPINION Second Amended Opinion dated January 7, 2008

("*Forrester Second Amended Opinion*"). In that *Forrester Second Amended Opinion* the U.S. Court of Appeals 9th opined that "[p]eople do not have a subjective expectation of privacy in numbers that they dial * * * Analogously, email and Internet users have no expectation of privacy in the to/from addresses of their message[s]".

61. In that pleading Plaintiff/defendant also argued that given the U.S. Court of Appeals 9th *Forrester Second Amended Opinion* "[a]t a minimum Cisco should have produced the telephone logs and email headers under their custody and control, as requested in that subpoena, and if necessary Cisco could have requested an in-camera review of any writings that Cisco may wish to argue protective orders for[.]".

62. In that pleading, Plaintiff/defendant also challenged Judge MANOUKIAN and requested for Plaintiff/defendant's Motion to Enforce the Second Cisco Records Subpoena to be reassigned to Department 6 of that California Trial Court presided in then by Judge POCHÉ who had presided at the June 20, 2008 hearing on Plaintiff/defendant's Motion to Enforce the First Cisco Records Subpoena, or to Department 10 of that California Trial Court presided in by the Honorable Judge NEAL ANTHONY CABRINHA who was the case management judge in the Tennant Action.

63. The reason why Plaintiff/defendant challenged Judge MANOUKIAN was due to acts and comments made by Judge MANOUKIAN at another hearing in the Tennant Action held on July 11, 2008. At that July 11, 2008 hearing Judge MANOUKIAN berated Plaintiff/defendant for appearing in propria persona, and also at that hearing Judge MANOUKIAN stated he knew the father of Mr. DENNIS JOHN SINCLITICO Jr.; Mr SINCLITICO Jr. is at the firm MORGAN LEWIS and was representing third party witness CISCO in the Tennant Action and at that hearing on July 11, 2008.

64. That hearing in the Tennant Action held on July 11, 2008 was for CISCO's Motion to Quash a DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE that Plaintiff/defendant had issued on May 23, 2008 directing the Custodian of Records of CISCO to appear at the hearing on June 20, 2008 ("First Cisco Appearance Subpoena"). The June 20, 2008 hearing date was for the hearing on Plaintiff/defendant's Motion to

1      Enforce the First Cisco Records Subpoena following CISCO's position that they would

2      not respond to the First Cisco Records Subpoena until the court has issued a ruling in that

3      matter. CISCO objected to that First Cisco Appearance Subpoena as well by filing a

4      Motion to Quash Plaintiff/defendant's First Cisco Appearance Subpoena thereby

5      obstructing the Custodian of Records of CISCO from appearing at the June 20, 2008

6      hearing. At that July 11, 2008 hearing Judge MANOUKIAN granted CISCO's Motion to

7      Quash Plaintiff/defendant's First Cisco Appearance Subpoena.

8    65. CISCO would neither produce records requested in Plaintiff/defendant's First Cisco

9       Records Subpoena, nor provide CISCO personnel to appear and testify at hearing.

10   66. Given Judge MANOUKIAN's acts and comments made at the July 11, 2008 hearing,

11       Plaintiff/defendant believed he would not have fair representation in any future matters

12       pertaining to Plaintiff/defendant that would be adjudicated by Judge MANOUKIAN.

13       Therefore on August 19, 2008 when Plaintiff/defendant filed his Motion to Enforce the

14       Second Cisco Records Subpoena, in Plaintiff/defendant's pleading for that motion

15       Plaintiff/defendant requested for the hearing on that motion to be reassigned from

16       Department 7 of that California Trial Court, presided in then by Judge MANOUKIAN

17       who owned the discovery calendar and as a result of which the hearing on that motion

18       would automatically get assigned to that Department 7, to instead either Department 6 of

19       that California Trial Court presided in then by Judge POCHÉ or Department 10 of that

20       California Trial Court presided in by Judge CABRINHA. Judge POCHÉ on June 20,

21       2008 had told Plaintiff/defendant that he was "allowed" to propound civil discovery on

22       CISCO.

23   67. Judge MANOUKIAN however refused to recuse himself from the hearing on

24       Plaintiff/defendant's Motion to Enforce the Second Cisco Records Subpoena, and on

25       September 11, 2008 at or about 2 P.M. Judge MANOUKIAN issued a tentative ruling

26       which provided that "Defendant has filed a challenge for cause which this Department

27       has answered. Good cause appearing IT IS ORDERED that the hearing on the motion is

28       CONTINUED to 10 October 2008 at 8:30 a.m. in this Department.".

PILLAY v. CISCO SYSTEMS, INC. et alia     **COMPLAINT**                        Page 19

68. Pursuant to the California Code of Civil Procedure ("California CCP") § 2024.020(a), that tentative ruling appeared to be unlawful because trial for the Tennant Action was set to start on October 14, 2008, and October 10, 2008 would be only one work day prior to that trial. California CCP § 2024.020(a) in pertinent part provides that "[a]ny party shall be entitled as a matter of right to complete discovery proceedings on or before the 30th day, and to have motions concerning discovery heard on or before the 15th day, before the date initially set for the trial of the action[.]".

69. Plaintiff/defendant believed it would be moot to contest that tentative ruling issued by Judge MANOUKIAN because first it appeared unlawful, and second Judge MANOUKIAN had refused to recuse himself from the hearing on Plaintiff/defendant's Motion to Enforce the Second Cisco Records Subpoena, and third given Judge MANOUKIAN's acts and comments made at the July 11, 2008 hearing.

70. Judge MANOUKIAN's tentative ruling issued at 2:00 P.M. on September 11, 2008 was adopted as Order of that court on the next day on September 12, 2008.

71. On August 19, 2008 Plaintiff/defendant also filed a Motion for Continuance of Trial, because trial in the Tennant Action was set to start on October 14, 2008 and there was not sufficient time to propound civil discovery on CISCO prior to that trial. In that Motion for Continuance of Trial Plaintiff/defendant requested that court to continue the trial for the Tennant Action to April 13, 2009.

72. The hearing on Plaintiff/defendant's Motion For Continuance of Trial was set for 9:00 A.M. on September 11, 2008 and was held in Department 2 of that California Trial Court presided in by the Right Honorable Judge WILLIAM J. ELFVING. Judge ELFVING denied Plaintiff/defendant's Motion for Continuance of Trial. It appears that Judge ELFVING, when he was in private practice at the law firm HOGE, FENTON, JONES & APPEL, INC. in San Jose, California, had represented Judge MANOUKIAN who was the defendant in an alleged malpractice civil action in *Gervich v. Manoukian,* case number 1-93-CV-728852, in that California Trial Court.

73. Perhaps Plaintiff/defendant's Motion for Continuance of Trial and Plaintiff/defendant's Motion to Enforce the Second Cisco Records Subpoena should have been reviewed and adjudicated by another judge in another department in that California Trial Court since the two Motions were inter-related. And further, given that Plaintiff/defendant had challenged Judge MANOUKIAN, perhaps another judge other than Judge ELFVING, given that Judge ELFVING had represented Judge MANOUKIAN in a prior alleged malpractice civil action in that court, should have reviewed and adjudicated on Plaintiff/defendant's Motion for Continuance of Trial.

74. Effectively that California Trial Court on September 11, 2008, via Judge ELFVING's Order issued at 9:00 A.M. denying Plaintiff's Motion for Continuance of Trial, and via Judge MANOUKIAN's tentative ruling issued at 2:00 P.M. which continued Plaintiff/defendant's Motion to Enforce the Second Cisco Records Subpoena to October 10, 2008 that would be one work day prior to the start of trial that was set for October 14, 2008, obstructed Plaintiff/defendant's attempts to propound civil discovery on CISCO in that court.

75. On September 22, 2008 Plaintiff filed a PETITION FOR WRIT OF MANDATE AND PROHIBITION and REQUEST FOR STAY OF FURTHER PROCEEDINGS in the Court of Appeal of the State of California Sixth Appellate District ("California Court of Appeal 6th"), case number H033374, against that California Trial Court. Plaintiff became the petitioner (Plaintiff/petitioner) in that petition to the California Court of Appeal 6th. Plaintiff/petitioner's prayer for relief in that petition was: "

    1. An alternative writ of mandate issue directing respondent court to:

        a. Vacate its order of September 11, 2008, issued by Judge William J. Elfving presiding in Department 2 of respondent court, denying Defendant's motion for continuance of trial, and to enter a new order granting Defendant's motion for continuance trial of case number 1-07-CV-093007.

b. Vacate its Order adopted on September 12, 2008, the tentative ruling for which appeared to have been issued by Judge Socrates P. Manoukian on September 11, 2008. That Order continued the hearing on Defendant's motion to enforce the second revised Deposition Subpoena for Production of Business Records to October 10, 2008.

c. Submit respondent court case number 1-07-CV-093007 to the chairperson of the Judicial Council of the State of California for assignment of a different judge for the determination of the question of disqualification of Judge Socrates P. Manoukian, and for the hearing on Defendant's unresolved motion to enforce the second revised Deposition Subpoena for Production of Business Records. Any new hearing date should be set to occur during a time period where discovery would be re-opened for the respondent court case number 1-07-CV-093007.

2. A peremptory writ of prohibition issue directing respondent court to:

a. Disqualify Judge Socrates P. Manoukian from any and all further respondent court proceedings involving the Defendant, including disqualifying the judge from the hearing on Defendant's motion to enforce the second revised Deposition Subpoena for Production of Business Record that has been continued to October 10, 2008.

b. Stay any and all further respondent court proceedings scheduled for respondent court case number 1-07-CV-093007, pending the resolution of this Petition for Writ of Mandate and Prohibition.

3. For such other and further relief as the Reviewing Court may deem proper. ".

76. On September 26, 2008 the Honorable Justice NATHAN DEAN MIHARA of the California Court of Appeal 6th issued the decision of that court in case number H033374 which provided that: "[T]he petition for writ of mandate and prohibition and the request for stay are denied. (Mihara, Acting P.J., and McAdams, J., participated in this

decision.[)]". The Honorable Justice PATRICIA BAMATTRE-MANOUKIAN, the wife of the Right Honorable Judge SOCRATES PETER MANOUKIAN in the California Trial Court, is a Justice of the California Court of Appeal 6th. Plaintiff pondered whether the operation of a "sandbox" discovery calendar in that California Trial Court, combined with the Right Honorable Judge SOCRATES PETER MANOUKIAN (the husband) being assigned the discovery calendar of that California Trial Court and as a result being the designated judge to review and adjudicate on all discovery disputes in all unlimited jurisdiction cases on the discovery calendar in that California Trial Court, and combined with Justice PATRICIA BAMATTRE-MANOUKIAN (the wife) being a justice of the California Court of Appeal 6th which was the Reviewing Court for that California Trial Court, provided sufficient independence and separation of powers between those two courts within the judicial branch of the government of California.

77. The mandatory pre-trial settlement conference in the Tennant Action was conducted on October 8, 2008 with Mrs. SUZANNE KING NUSBAUM presiding as judge pro tempore for Department 10 of that California Trial Court. Mrs. NUSBAUM stated that her husband worked for CISCO. No agreement was reached at that pre-trial settlement conference and the Tennant Action proceeded to trial set to start on October 14, 2008.

78. On October 10, 2008 Plaintiff/defendant emailed Mr. SINCLITICO Jr. and Ms. JENNIFER ROSE FEARNOW, attorneys at the law firm MORGAN LEWIS, and carbon copied their administrative assistant Ms. PAULA R. LESURE, stating: "Dear Mr. Sinclitico and Ms. Fearnow, Please be advised that the trial for case number 1-07-CV-093007 has been re-assigned from Department 10 to Department 1 of the Superior Court, County of Santa Clara, and set to start at 1:30 P.M. on October 14, 2008. I request that both of you appear as witnesses at that trial, and in addition please bring along whomever person or persons you believe would best be able to answer queries regarding the Custodian of Records of Cisco Systems Inc.'s policy and ability to respond to requests for propounding civil discovery, and including the ability to respond to requests for

production of electronic records. Thank you in advance. Very truly yours, Kenneth D. A. Pillay.".

79. On October 10, 2008 Ms. FEARNOW at MORGAN LEWIS replied via email to Plaintiff/defendant and stated: "Mr. Pillay, Dennis Sinclitico and I respectfully decline. Best regards, Jennifer R. Fearnow, Morgan, Lewis & Bockius LLP".

80. On October 14, 2008 Plaintiff/defendant caused to be served CIVIL SUBPOENA FOR PERSONAL APPEARANCE AT TRIAL OR HEARING to Mr. SINCLITICO Jr., Ms. FEARNOW and the Custodian of Records of CISCO formally requesting their appearance at trial at 1:30 P.M. in Department 1 of that California Trial Court in the Tennant Action. None of the persons requested in those subpoenas appeared at trial in the Tennant Action.

81. Plaintiff/defendant appeared at trial in the Tennant Action at 1:30 P.M. on October 14, 2008 in Department 1 of that California Trial Court presided in then by the Honorable Judge JAMES PAUL KLEINBERG.

82. In Mr. TENNANT's trial brief for the trial in the Tennant Action it was alleged in pertinent part that Mr. TENNANT "[b]egan providing legal services to Defendant * * * pursuant to an oral argument to provide legal services[.]".

83. In Plaintiff/defendant's pleading for Plaintiff/defendant's Motion for Continuance of Trial filed with that California Trial Court on August 19, 2008 Plaintiff/defendant had attached as Exhibit A to that pleading, a copy of an ATTORNEY FEE AGREEMENT OF REPRESENTATION that was not signed by Plaintiff/defendant ("Unsigned Fee Document"). Plaintiff/defendant did not have a written agreement with Mr. TENNANT.

84. In the COMPLAINT-Contract that Mr. TENNANT had filed in that California Trial Court on August 27, 2007 to initiate the Tennant Action, Mr. TENNANT, the plaintiff in the Tennant Action, had alleged in pertinent part that "[A] written agreement for legal services was entered into between Plaintiff and Defendant on or about October 15, 200[2]".

85. Mr. TENNANT effectively changed his allegation in his trial brief shortly before trial in the Tennant Action, but not in an Amended Complaint, after Plaintiff/defendant had shown to that court that there was no signed written contract between Mr. TENNANT and Plaintiff/defendant. In hindsight, perhaps Plaintiff/defendant should have instead produced the Unsigned Fee Document at trial itself in the Tennant Action. Perhaps also that court should have dismissed the Tennant Action before trial because on August 19, 2008 Plaintiff/defendant had shown to that court that there was no signed written contract between Mr. TENNANT and Plaintiff/defendant that could have been enforced by that court.

86. At trial in the Tennant Action, Plaintiff/defendant settled. Plaintiff/defendant had not been able to obtain any records, or appearance of persons at hearing or trial, from CISCO. Plaintiff/defendant believes his defense, and right to cross-complain, in the Tennant Action was irreparably harmed by CISCO's relentless stonewalling and refusal to comply with Plaintiff/defendant's deposition subpoenas that were issued to CISCO in preparation for trial in the Tennant Action.

87. Sometime after October 20, 2008, which was after the trial in the Tennant Action, Plaintiff received via U.S. mail a copy of a document endorse filed on October 20, 2008 in that California Trial Court. That document was titled RULING ON MOTION TO DISQUALIFY SANTA CLARA COUNTY SUPERIOR COURT JUDGE SOCRATES MANOUKIAN FOR CAUSE. That ruling was dated October 2, 2008 and appears to have been issued by the Honorable Judge MARK HALL TANSIL presiding in the Superior Court of the County of Sonoma in California. In that ruling, Judge TANSIL stated that he received an appointment from the Honorable RONALD MARC GEORGE, Chief Justice of the California Supreme Court (Chief Justice GEORGE is also the Chairperson of the California Judicial Council) to review Plaintiff/defendant's challenge to disqualify Judge MANOUKIAN. In that ruling, which was issued on October 2, 2008, Judge TANSIL denied Plaintiff/defendant's challenge to disqualify Judge MANOUKIAN. Plaintiff/defendant does not know which documents in the Tennant

1   Action were provided to Judge TANSIL and whether Judge TANSIL was made aware of

2   the fact that Judge MANOUKIAN had issued a tentative ruling to continue the hearing on

3   Plaintiff/defendant's Motion to Enforce the Second Cisco Records Subpoena to October

4   10, 2008 which would be one work day prior to the start of trial in the Tennant Action

5   which was set to start on October 14, 2008 and which therefore appeared unlawful

6   pursuant to California CCP § 2024.020(a).

7   **BACKGROUND ON PLAINTIFF'S AND PLAINTIFF'S TEAM'S WORK AT CISCO**

8   **AND FACTORS PERTAINING TO CASE # 1:08-CV-10764-PGG FILED IN THE U.S.**

9   **DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

10  88. The allegations set forth in the preceding paragraphs are re-alleged and incorporated

11  herein by reference as if set forth fully herein.

12  89. On information and belief, while Mr. TENNANT in the Tennant Action attempted to

13  enforce a written fee agreement against Plaintiff/defendant that Mr. TENNANT alleged

14  existed between Mr. TENNANT and the Plaintiff/defendant (there was in fact no signed

15  written agreement between Mr. TENNANT and the Plaintiff/defendant), and while Mr.

16  TENNANT pressured CISCO to attempt to claim by force or coercion payment for

17  alleged attorney fees arrears against stock options held by CISCO on behalf of Plaintiff,

18  instances of Plaintiff's and Plaintiff's team's work involvement at CISCO that may be

19  controversial to Defendants, and that may reveal errors or failures by Defendants, may

20  have been combined with the pressure that Mr. TENNANT exerted on CISCO to cause

21  Defendants in themselves or via their current or former directors, officers, employees,

22  agents, assigns or affiliated companies, to commit or aid, abet, counsel, command, induce

23  the alleged violations against Plaintiff.

24  90. Plaintiff was employed by CISCO on or about May 19, 1997 and CISCO stopped paying

25  Plaintiff without reason or cause on or about November 7, 2007. Plaintiff's first position

26  at CISCO was as manager of engineering in software development. At CISCO, Plaintiff

27  managed various projects and engineering teams and Plaintiff's career progressed to

28  senior manager of engineering in software development and subsequently Plaintiff held

1  the position of director of engineering (an executive level position) in software

2  development for more than five years prior to when CISCO stopped paying Plaintiff

3  without reason or cause on or about November 7, 2007. Plaintiff made valuable

4  contributions to CISCO.

5  91. One of Plaintiff's significant valuable contributions to CISCO pertained to the First

6  Customer Shipment ("FCS") of new software called "Cisco IOS Software Modularity"

7  which was produced as software executable images in a software release from CISCO

8  called IOS Software Release 12.2(18)SXF4 which occurred on or about March 27, 2006.

9  Plaintiff had department ownership and budget, core software development engineering,

10  and overall program management responsibility within CISCO's central software

11  organization for that Cisco IOS Software Modularity program at CISCO. Plaintiff

12  directed a team consisting of engineering managers, engineers, and program managers,

13  located in various geographies, in addition to directing coordination of contribution to the

14  Cisco IOS Software Modularity program by various cross-functional teams across

15  CISCO.

16  92. Based on publicly available information, with CISCO's vanilla Internetworking

17  Operating Systems ("IOS") software, if a user executes the IOS software on a CISCO

18  product and subsequently the user experiences a software fault on that CISCO product,

19  the user needs to reboot (restart) that CISCO product to recover from that software fault

20  and thereby losing all the functions that the CISCO product was providing.

21  93. With the new Cisco IOS Software Modularity software, a software fault occurring in

22  substantial parts of the Cisco IOS Software Modularity software would no longer require

23  a reboot of the CISCO product. Only the software process, which contained the offending

24  software that caused the software fault, would need to be restarted while that CISCO

25  product continued to perform other functions such as continuing to process and forward

26  data packets and as a result continuing to maintain connectivity within a communications

27  network built using CISCO products that executed the Cisco IOS Software Modularity

28  software. The end result to the user would be that the user would experience greater

availability of services and applications when executed within a communications network that is built using the Cisco IOS Software Modularity software that executed on CISCO products.

94. Following the FCS of the Cisco IOS Software Modularity, Plaintiff was assigned additional responsibilities which included directing a program to leverage and incorporate Open Source software in derivative works developed at CISCO. The Linux software and GNU software constitutes a significant amount of the Open Source software used in computer systems developed by many persons and entities including commercial corporations. The Free Software Foundation, Inc. ("FSF") provides licenses which control the copy, distribution and modification of the GNU software and Linux software, among other software.

95. The two most common FSF software licenses are the GNU General Public License version 2 ("GPLv2") and the GNU Library General Public License version 2 ("LGPLv2"). The Linux software and most of the GNU software are licensed under GPLv2, whereas some other GNU software including certain software libraries are licensed under the LGPLv2 license. The term "GPL" shall be used hereinafter in this COMPLAINT as a generic term referring individually and interchangeably to either the GPLv2 or LGPLv2, or collectively to refer to GPLv2 and LGPLv2. Where the need arises for being more specific, the terms GPLv2 and LGPLv2 shall be used individually.

96. While at CISCO, Plaintiff advocated compliance with the GPL when leveraging and incorporating Open Source software programs and libraries in derivative works from CISCO, a view that may not have been widely shared by Defendants.

97. In the action in *Free Software Foundation, Inc. v. Cisco Systems, Inc.*, case number 1:08-CV-10764-PGG, filed on December 11, 2008 ("*FSF-Cisco Action*") in the U.S. District Court for the Southern District of New York ("USDC SDNY") it appears that the FSF, after many years of informal negotiations with CISCO, attempted to enforce compliance with the GPL, among other relief requested, against CISCO. CISCO did not file an Answer to the Complaint in that *FSF-Cisco Action*. An order issued by the USDC SDNY

court on March 9, 2009 provided in pertinent part that "[I]T IS HEREBY ORDERED that Defendant Cisco Systems Inc., has until April 17, 2009, to answer or otherwise respond to the Complaint filed on December 11, 2008, by Plaintiff Free Software Foundation. No further extension will be granted. IT IS SO ORDERED[.]".

98. GPLv2 Section 3 through 3(b) provides that:

> "3) You may copy and distribute the Program (or a work based on it, under Section 2) in object code or executable form under the terms of Sections 1 and 2 above provided that you also do one of the following:
>
> a) Accompany it with the complete corresponding machine-readable source code, which must be distributed under the terms of Sections 1 and 2 above on a medium customarily used for software interchange; or,
>
> b) Accompany it with a written offer, valid for at least three years, to give any third party, for a charge no more that your cost of physically performing source distribution, a complete machine-readable copy of the corresponding source code, to be distributed under the terms of Sections 1 and 2 above on a medium customarily used for software interchange; or,"

99. If a person or entity incorporates, in whole or in modified versions of, GPLv2 licensed software programs in their derivative works, then that person or entity needs to comply with Section 3 of the GPLv2. If the person or entity does not comply with Section 3(a) or 3(b) of the GPLv2, then downstream software developers and end users are deprived of their right to leverage and incorporate the undisclosed source code corresponding to the derivative works which had incorporated GPLv2 licensed software programs, which in turn may be construed as unfair competition, or unfair or deceptive acts or practices in or affecting commerce.

100.     Enforcing compliance with the GPL licenses can be a challenge when a person or entity does not disclose the source code corresponding to a derivative work that incorporated GPL licensed software programs or libraries.

101.     If this Court has the jurisdiction, perhaps one approach that may encourage compliance with the GPL licenses may be for this Court to issue an order directing that a unique legally-enforceable dated and signed certificate should accompany each and every software release made by Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies to certify that no violations or infringements are known of in the derivative works software executable images that are provided in each and every of those software releases.

102.     Further, if this Court has the jurisdiction, perhaps if the Court were to issue an order amending the GPLv2 license by completely striking out Section 3(b) from the GPLv2 and relying only on Section 3(a) as the authority for production of corresponding source code, it may help to induce more pro-active production of source code corresponding to derivative works which incorporate GPLv2 licensed software programs or libraries. Persons or entities who sometimes comply with Section 3(b) of the GPLv2 do so by issuing the written offer to produce corresponding source code on demand, in a few lines of text embedded in a large multi-page document, and therefore the written offer to produce corresponding source code is not prominently displayed or advertised to a potential downstream developer or user who may wish to incorporate or use such corresponding source code. Corporations often use internet sites under their custody and control as the mediums for software downloads so perhaps in that Amendment to GPLv2 the Court could also amend Section 3(a) of the GPLv2 to direct that the internet be the preferred medium for a corporation to produce source code corresponding to derivative works that are developed and offered for sale by that corporation and that incorporate GPLv2 licensed software.

103.     The GPL compliance issue may not be specific to one person or entity, because a derivative work is often built through a supply chain environment where multiple persons

1
2

or entities along the chain "touch" a derivative work, in part or in whole, before the final
derivative work makes its way as a product sold to a customer or reseller.

3
4
5
6
7

104.     On information and belief, the supply chain scenario pertaining to the *FSF-Cisco Action* involves BROADCOM CORPORATION, a California corporation # C1696389, ("BROADCOM") as an Original Design Manufacturer ("ODM") who supplies prototype products to CISCO's LINKSYS division and which CISCO in turn modifies or repackages, and sells the derivative works to customers or resellers.

8
9
10

105.     On or about January 20, 2007 CISCO posted a writing titled "Open Source Researcher Alerts Cisco to GPL issue" at CISCO's blogs.cisco.com website. In that writing CISCO stated:

11
12
13
14
15
16
17

"Last week, an open-source software researcher, Armijn Hemel, a consultant with Loohius Consulting, alerted some bloggers and other media about one of our iPhone models (WIP300) not being compliant with the GNU general public license. Cisco has thoroughly investigated the information Mr. Hemel brought to our attention related to the Cisco iPhone WIP300 model as reported. Based on our investigation, Cisco is taking steps to resolve a single issue raised regarding this product's compliance with the GNU General Public License, or GPL.

18

19
20
21
22
23
24
25

Cisco has thoroughly investigated the other issues and verified the product's compliance with the GPL. We thank Mr. Hemel for apprising us of this matter and we encourage others in the open-source community to continue working with Cisco in these important areas of research and development. Compliance with open standards is very important to us and we will continue to take the necessary actions to ensure we are meeting the requirements of open source licenses we use."

26
27

106.     On January 18, 2007 a Public Relations person at CISCO stated in an email to Plaintiff, and one of Plaintiff's team member, and other persons at CISCO, in pertinent

28

1  part that "[t]his is becoming a royal pain-in-the-ass with reporters and bloggers taking

2  potshots at us for hypocrisy, in light of our suit against Apple[.]".

3  107.  On information and belief, that particular violation of the GPL by CISCO in that

4  Cisco iPhone WIP300 model derivative work pertained to the incorporation of the

5  "mySTUN" (Simple Traversal of UDP through NATS) server software program which is

6  copyrighted and licensed under the GPL.

7  108.  In the COMPLAINT for the *FSF-Cisco Action*, the FSF alleges that GPL

8  software "is distributed on a wide range of products sold by commercial vendors

9  including IBM, Hewlett-Packard, Nokia, and Dell", and other GPL software are used to

10  build a large proportion of the software available for GNU/Linux, BSD, Sun Solaris, Mac

11  OSX, and other Unix-like operating systems, and to build programs for use with

12  Microsoft Windows and other non-Unix operating systems. Effectively, GPL licensed

13  software programs and libraries are either incorporated or used pervasively in the

14  development of many derivative works by many corporations.

15  109.  Plaintiff's and Plaintiff's team's involvement with the CISCO LINKSYS GPL

16  compliance issue at CISCO which was subsequently alleged in the *FSF-Cisco Action*,

17  that may be controversial to Defendants, and that may reveal errors or failures by

18  Defendants, may have been combined with the pressure that Mr. TENNANT exerted on

19  CISCO to cause Defendants in themselves or via their current or former directors,

20  officers, employees, agents, assigns or affiliated companies, to commit or aid, abet,

21  counsel, command, induce the alleged violations against Plaintiff.

22  **ADDITIONAL BACKGROUND ON PLAINTIFF'S AND PLAINTIFF'S TEAM'S WORK**

23  **AT CISCO THAT MAY BE RELEVANT FACTORS TO THE FEDERAL ACTION**

24  110.  The allegations set forth in the preceding paragraphs are re-alleged and

25  incorporated herein by reference as if set forth fully herein.

26  111.  On information and belief, the incorporation of GPL licensed software programs

27  and libraries in CISCO derivative works is so pervasive that more CISCO derivative

28  works may be afflicted with the GPL compliance issue.

112.     In another instance of Plaintiff's and Plaintiff's team's involvement with CISCO's incorporation of Open Source software programs in derivative works, on or about May 9, 2007 one of Plaintiff's team members at CISCO brought to Plaintiff's attention, given Plaintiff's "responsibility for parts of IOS", that a GPL compliance issue had been detected in the Cisco IOS source code repositories. On information and belief, three source code files *fp-bit.c*, *dp-bit.c* and *fp-bit.h*, which contained source code corresponding to software math floating point functions provided in the FSF's "*libgcc*" library file, had been committed into the */vob/ios/sys/tcl-bleeding/soft-float* sub-directory, and possibly in other sub-directories, in the source code repositories at CISCO in or about the month of March, 2002 and that continued to exist in the source code repositories at CISCO.

113.     The compiled version of the *libgcc* library file is used by the FSF's GNU Compiler Collection ("GCC") programs to provide access to library functions. In addition to the permissions in the GPL, the FSF gives unlimited permission to link the "compiled version of the *libgcc* library file" into combinations with other software programs, and to distribute those combinations without any restriction coming from the use of the compiled version of the *libgcc* library file.

114.     The GPL restrictions, including Section 3(a) of the GPLv2, however do strictly apply in other respects, for example if the *libgcc* library file is modified and distributed when not linked as a compiled version into a combine software executable image.

115.     The source code in the *fp-bit.c* and *dp-bit.c* files, corresponding to source code in the *libgcc* library file, that were committed into the source code repositories at CISCO were "source code extracts" from the *libgcc* library file that were then compiled at CISCO using the FSF's GCC compiler into derived software objects and the resulting derived software objects were then linked with other software objects derived from other software source code developed at CISCO to form Cisco IOS software executable images derivative works that can be executed on CISCO routers and switches products. That meant that the corresponding source code to the Cisco IOS software executable images

derivative works had then become infected or contaminated by the source code extracts corresponding to those GPL licensed software library functions that had been copied from the FSF's *libgcc* library file and that had been committed into the source code repositories at CISCO. As a result the Cisco IOS software executable images derivative works then became subject to control under the FSF's GPLv2 license. CISCO provides the Cisco IOS software executable images derivative works, either separate from or with Cisco routers and switches high gross margin products, to end customers and resellers.

116.     At shipment of those Cisco IOS software executable images derivative works CISCO did not produce, or issue a written offer to produce on demand, the source code corresponding to those Cisco IOS derivative works which had incorporated the GPL licensed software programs corresponding to the software math floating point library functions contained in and derived from the *libgcc* library file.

117.     Plaintiff's and Plaintiff's team's involvement with the GPL compliance issue at CISCO pertaining to incorporation of certain software math floating point library functions, the source code of which were copied from the FSF's *libgcc* library file, and compiled into software objects at CISCO and that were in turn combined into Cisco IOS software executable images derivative works, that may be controversial to Defendants, and that may reveal errors or failures by Defendants, may have been combined with the pressure that Mr. TENNANT exerted on CISCO to cause Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, to commit or aid, abet, counsel, command, induce the alleged violations against Plaintiff.

118.     In another instance of Plaintiff's involvement with CISCO's incorporation of Open Source software programs in CISCO derivative works, Plaintiff discussed with a Vice President of a Business Unit at CISCO who was responsible for certain Unified Communications products at CISCO, towards Plaintiff's team assisting that business unit with the support and maintenance of the Linux software kernel and software extensions used in those derivative works produced by that business unit at CISCO. This was part of

an overall proposal by Plaintiff for Plaintiff's centralized software development team to manage and maintain the Linux software kernel, and software extensions developed at CISCO, on behalf of multiple software development client teams across CISCO that incorporate Open Source software in their derivative works, thus avoiding duplication of effort and resources across CISCO.

119.    On information and belief, in that particular Unified Communications derivative work CISCO partly manufactures a product called *Call Manager* which provides call management functions for Voice over IP deployment. That *Call Manager* product consists of computer hardware procured from other outside corporations onto which the RED HAT, INC., a Delaware corporation # C2128701, Enterprise Linux ("RHEL") software is installed. The RHEL software contains Linux software programs licensed under GPLv2. CISCO then incorporates further software programs and modifications with the RHEL installed software to provide the *Call Manager* derivative work. Cisco in turn sells, resells or sublicenses this derivative work to end customers or resellers, or sublicensees including on information and belief the HEWLETT-PACKARD COMPANY, a Delaware corporation # C2106969.

120.    At shipment of this derivative work neither CISCO nor its sublicensees appear to have produced, or issued a written offer to produce on demand, the source code corresponding to the *Call Manager* derivative work which incorporated GPLv2 licensed software programs.

121.    Plaintiff's and Plaintiff's team's involvement at CISCO pertaining to incorporation of GPLv2 licensed Linux software into CISCO's *Call Manager* derivative work, that may be controversial to Defendants, and that may reveal errors or failures by Defendants, may have been combined with the pressure that Mr. TENNANT exerted on CISCO to cause Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, to commit or aid, abet, counsel, command, induce the alleged violations against Plaintiff.

122.    In another instance of Plaintiff's and Plaintiff's team's involvement with
CISCO's incorporation of Open Source software in CISCO derivative works, Plaintiff
and Plaintiff's team interacted with another peer software development team at CISCO
that had incorporated the Cisco IOS software with GPLv2 licensed Linux software
programs for use as the operating system software for the Cisco ASR 1000 Aggregation
Services Routers ("*Cisco ASR 1000*"). Based on publicly available information, the
operating system software for the *Cisco ASR 1000* consists of what CISCO calls the
BINOS kernel, which is a derivative work of GPL licensed Linux software, plus IOSD
(IOS daemon) which is Cisco IOS software executing as a software process within the
BINOS/Linux software which executes on the route processor hardware in the *Cisco ASR
1000*.

123.    On information and belief, at shipment of that BINOS plus IOSD operating
system software for the *Cisco ASR 1000*, CISCO did not provide the corresponding
source code, or issue a written offer to produce on demand the corresponding source code
for that BINOS plus IOSD operating system software, which was a derivative work that
incorporated GPLv2 licensed Linux software programs, for the *Cisco ASR 1000*.

124.    Based on publicly available information, the BINOS plus IOSD operating system
software for the *Cisco ASR 1000* could be viewed as another type of Cisco modular IOS
operating system software which uses a more coarse-grained approach where the IOS
software executes in one active software process which is the IOSD software daemon
(the term "daemon" is equivalent to "process" in this software context and is typically
used to refer to a background software process that exists within a unix-like software run-
time environment). Two copies of the IOSD are spawn at run-time by BINOS executing
on the *Cisco ASR 1000*; one copy is the active IOSD which executes the IOS software
and the other copy of is a backup or redundant IOSD to provide software-based
switchover redundancy in the event that a software fault occurs in the active IOSD.

125.    The BINOS software had initially come into CISCO via an acquisition. Certain
CISCO senior management had attempted to pressure Plaintiff into merging the BINOS

1  plus IOSD operating system software with the microkernel-based Cisco IOS Software

2  Modularity operating system software that Plaintiff and Plaintiff's team was responsible

3  for at CISCO. The microkernel-based Cisco IOS Software Modularity operating system

4  software incorporated a proprietary (not Linux) microkernel and Plaintiff's team was also

5  investigating a migration path whereby the Infrastructure software that Plaintiff's team

6  had developed for the microkernel-based Cisco IOS Software Modularity operating

7  system software could be leveraged and modified to work on top of the Linux software

8  kernel and thus avoiding dependency by CISCO on a single proprietary kernel vendor

9  source. The microkernel-based Cisco IOS Software Modularity operating system

10 software had more granular software processes, with the IOS software executing in more

11 than one active software process, as compared to the BINOS plus IOSD operating system

12 software for the *Cisco ASR 1000*.

13 126.    Plaintiff's team conducted an analysis of the BINOS plus IOSD operating system

14 software for the *Cisco ASR 1000* to investigate areas for potential leverage and

15 convergence between those two Cisco modular IOS operating system software solutions.

16 Plaintiff's team discovered instances where the BINOS plus IOSD operating system

17 software had been modified to enable IOS to execute over Linux, and software

18 modifications had been made to support the *Cisco ASR 1000* hardware, which when

19 shipped to customers would cause the BINOS plus IOSD operating system software to

20 need to comply with the GPLv2. As a result of Plaintiff's team investigation of the

21 BINOS plus IOSD operating system software, Plaintiff declined to incorporate software

22 from the BINOS plus IOSD operating system software with the microkernel-based Cisco

23 IOS Software Modularity operating system software that Plaintiff and Plaintiff's team

24 was responsible for, in order to avoid any potential GPL infection or contamination by

25 software originating from the BINOS plus IOSD operating system software the latter of

26 which was Linux-based and hence had to conform to GPLv2 which controls Linux.

27 127.    On information and belief, CISCO may have released the BINOS plus IOSD

28 operating system software for the *Cisco ASR 1000* to customers for early evaluation. The

offer for sale of the BINOS plus IOSD operating system software either standalone or with the *Cisco ASR 1000* may have happened on or after November 7, 2007. CISCO currently continues to offer for sale the *Cisco ASR 1000* product.

128.     Plaintiff's and Plaintiff's team's involvement and investigation at CISCO pertaining to incorporation of GPLv2 licensed Linux software into the BINOS plus IOSD operating system software derivative work for the *Cisco ASR 1000* router product, that may be controversial to Defendants, and that may reveal errors or failures by Defendants, may have been combined with the pressure that Mr. TENNANT exerted on CISCO to cause Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, to commit or aid, abet, counsel, command, induce the alleged violations against Plaintiff.

129.     At CISCO, some of Plaintiff's recommendations, directions or questions that may be controversial to Defendants, and that may reveal errors or failures by Defendants, may have been combined with the pressure that Mr. TENNANT exerted on CISCO to cause Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, to commit or aid, abet, counsel, command, induce the alleged violations against Plaintiff.

130.     In one instance, having been assigned the responsibility for certain Open Source software development programs, Plaintiff and Plaintiff's team at CISCO initiated the development of a "clean room environment" Common Linux-based software stack for Embedded Systems ("*CLES*") which incorporated GPLv2 licensed software programs with other infrastructure software developed at CISCO for use as a Linux-based software stack for use in embedded systems derivative works developed at CISCO, while ensuring compliance with GPLv2 and LGPLv2.

131.     At CISCO, an alternative viewpoint was presented by one of Plaintiff's peers that CISCO should move the Linux-based, hence GPL-based, development programs to CISCO's development partner corporation in India, which that person argued would be outside the jurisdiction of the laws of the U.S. and hence argued that as a result CISCO

1  itself would not have to be concerned with compliance with the GPL. Plaintiff disagreed

2  with that viewpoint. Plaintiff proceeded to grow Plaintiff's software development team to

3  work on the Open Source based development programs assigned to Plaintiff by hiring

4  personnel in the U.S. including in Beaverton, Oregon, and California, and Atlanta,

5  Georgia, with those new hires reporting into an organization command chain directed by

6  Plaintiff. Plaintiff instilled to his team that compliance with the GPL licenses was

7  paramount when developing this new clean room environment *CLES* Linux-based

8  software stack.

9  132.  As part of building the *CLES* Linux-based software stack Plaintiff and Plaintiff's

10  team investigated "make" and "buy" options for the base Linux kernel. The "make"

11  option would be to download the Linux kernel sources available at the www.kernel.org

12  website and further build on top of that software base. The buy option would be to license

13  a Linux distribution ("distro") supported by a commercial vendor. Plaintiff and Plaintiff's

14  team recommended pursuing the buy option because the commercial vendor who would

15  supply the Linux distro to CISCO would provide support and bug fix integration to the

16  Linux kernel software, plus provide integration and test with other open source software

17  programs that are typically incorporated with the Linux kernel software during software

18  development efforts that leverage and incorporate Linux and other Open Source software.

19  One key criteria that Plaintiff and Plaintiff's team needed to fulfill was that the

20  commercial vendor who would supply the Linux distro to CISCO would need to have a

21  comprehensive range of Board Support Package ("BSP") to support the various

22  microprocessor families that were being used in the development of derivative works at

23  CISCO.

24  133.  The buy decision eventually narrowed to an analysis of two commercial vendor

25  corporations who sell Linux distros targeted at embedded systems development; one

26  corporation was MONTAVISTA SOFTWARE, INC., a Delaware corporation #

27  C1933155, ("MONTAVISTA") and another corporation was WIND RIVER SYSTEMS,

28  a Delaware corporation # C1828037, ("WIND RIVER"). After fairly thorough technical

PILLAY v. CISCO SYSTEMS, INC. et alia    **COMPLAINT**    Page 39

and business evaluations MONTAVISTA was recommended as the commercial vendor to supply the Linux distro to be used as the base for the *CLES* Linux-based software stack.

134.    It appears that Plaintiff's and Plaintiff's team's recommendation of MONTAVISTA as the commercial vendor to supply the Linux distro to be used as the base of the *CLES* Linux-based software stack may have met resistance higher up the command chain at CISCO. At that time the then Chief Development Officer ("CDO") of CISCO had overall responsibility for the development engineering teams at CISCO; that CDO is no longer at CISCO as of or about January 2, 2008. Sometime during the time period when Plaintiff and Plaintiff's team was evaluating the Linux distro commercial vendor coporations, Plaintiff attended a meeting between CISCO with WIND RIVER and which was attended by the Chief Executive Officer ("CEO") of WIND RIVER. At that meeting the CEO of WIND RIVER stated that his wife and the wife of the CDO of CISCO, who were supposedly residing neighbors, had suggested that the CEO of WIND RIVER should have a meeting at CISCO to present WIND RIVER's Linux software offerings to CISCO. Plaintiff's and Plaintiff's team's recommendation of MONTAVISTA as the vendor to supply the base Linux distro for the *CLES* Linux-based software stack did not change after that meeting with the CEO of WIND RIVER.

135.    Negotiations ensued between Plaintiff, Plaintiff's team, the Global Supply Management ("GSM") team at CISCO, a representative from the Legal team at CISCO, and MONTAVISTA and as a result a written Agreement was signed between CISCO and MONTAVISTA for MONTAVISTA to supply to CISCO the base Linux distro for use in the CLES Linux-based software stack.

136.    In or about the month of July 2007, which was budgeting time for CISCO's next fiscal year 2008, it was suggested that the budget for the Linux distro vendor should be split equally between WIND RIVER and MONTAVISTA. Plaintiff, who had budget responsibility for that program, disagreed as there were no specific Linux product

1   offerings that were required from WIND RIVER for the *CLES* Linux-based software
2   stack.

3   137.    Plaintiff's and Plaintiff's team's involvement and recommendation with the
4   procurement of the base Linux distro for the *CLES* Linux-based software stack from an
5   outside commercial vendor corporation that may be controversial to Defendants, and that
6   may reveal errors or failures by Defendants, may have been combined with the pressure
7   that Mr. TENNANT exerted on CISCO to cause Defendants in themselves or via their
8   current or former directors, officers, employees, agents, assigns or affiliated companies,
9   to commit or aid, abet, counsel, command, induce the alleged violations against Plaintiff.

10  138.    On or after March 27, 2006, after Plaintiff had assumed the responsibility for
11  directing certain development programs to incorporate Open Source software in
12  derivative works at CISCO, Plaintiff was allocated hiring requisitions to grow his team to
13  work on that additional responsibility. The engineering grades corresponding to the
14  positions that Plaintiff was hiring into included grades 6, 8, 10, 11 and 12, corresponding
15  to positions of Software Engineer II, Software Engineer III, Software Engineer IV,
16  Technical leader I, and Software Engineer V respectively at CISCO. At that time CISCO
17  contracted the services of an outside immigration counsel firm FRAGOMEN, DEL REY,
18  BERNSEN & LOEWRY, LLP ("FRAGOMEN") to assist CISCO with its immigration
19  and labor matters pertaining to employees of CISCO. During Plaintiff's recruiting efforts
20  to grow his team, an issue came up regarding the Prevailing Wage Policy Guidance
21  ("*Prevailing Wage*") which is administered by the U.S. Department of Labor.

22  139.    8 U.S.C. § 1182 (n)(1)(A)(i)(I-II) provides that:

23  "(n) Labor condition application

24          (1) No alien may be admitted or provided status as an H-1B nonimmigrant in
25      an occupational classification unless the employer has filed with the Secretary
26      of Labor an application stating the following:

27          (A) The employer –

28              (i)    is offering and will offer during the period of authorized

employment to aliens admitted or provided status as an H-1B

nonimmigrant wages that are at least –

(I)     the actual wage level paid by the employer to all other

individuals with similar experience and qualifications for the

specific employment in question, or

(II)     the prevailing wage level for the occupational

classification in the area of employment,

whichever is greater, based on the best information available as of

the time of filing the application[,]"

140.     Some of the candidates that Plaintiff's team interviewed for hire were
nonimmigrants and required authorization to work in the U.S.. When making an offer to a
new hire candidate Plaintiff and Plaintiff's team members had to specify a wage in the
offer letter. CISCO and FRAGOMEN stated that they used the Radford Benchmark
Survey as a guide for determining the *Prevailing Wage* that would need to be offered and
paid to a new hire if that candidate was a nonimmigrant and required U.S. authorization
to work in the U.S..

141.     The Radford Benchmark Survey (more information on RADFORD can be found
at the web site www.radford.com), and also the U.S. Department of Labor's FLC Data
Center, provide tiered levels of wages commensurate with experience, education, and the
level of supervision, to guide hiring managers in determining the *Prevailing Wage* to
offer and pay to a new hire candidate who needs a U.S. Labor Condition Application
("LCA") in order to obtain a H-1B nonimmigrant visa for that candidate to be able to
work in the U.S.. For example, on or about January 11, 2007 the Radford Benchmark
Survey annual wage guidance for the San Francisco Bay Area was U.S. $ 78232 for a
Software Engineer 2, and $ 96,869 for a Software Engineer 3, and $ 115, 745 for a
Software Engineer 4, and $ 142,633 for a Software Engineer 5, and $ 167,598 for a
Software Engineer 6. It appears that the Radford Benchmark Survey Software Engineer

2, 3, 4, 5 and 6 positions corresponded respectively to CISCO's grades 6, 8, 10, 11 and 12.

142.     On or about February 5, 2007 Plaintiff requested CISCO and FRAGOMEN for the *Prevailing Wage* that would need to be offered to the new hire candidates that Plaintiff and Plaintiff's team members wanted to make hiring offers to, whether an LCA was needed or not. Counsel at FRAGOMEN stated, on behalf of CISCO, that the estimated *Prevailing Wage* information, on an annual basis for San Jose, California, were U.S. $ 78,170 for CISCO's Grade 6, $ 93, 788 for grade 8, $ 93,788 for grade 10, $ 93,888 for grade 11 and $ 93,888 for grade 12, and that those *Prevailing Wage* would apply only to nonimmigrant candidates who needed an LCA to obtain a H-1B nonimmigrant visa in order for those candidates to work in the U.S.. CISCO and FRAGOMEN had capped the upper *Prevailing Wage* at CISCO to U.S. $ 93,888 for grade 8 and higher grades.

143.     Plaintiff expressed to CISCO and FRAGOMEN three concerns regarding CISCO's determination of *Prevailing Wage*. The first concern that Plaintiff expressed regarding CISCO's *Prevailing Wage* determination was why did CISCO have only two (2) *Prevailing Wage* amounts (U.S. $ 78,170 for CISCO's Grade 6, and U.S. $ 93, 788 for CISCO's grade 8 and higher). The second concern was why did CISCO cap the upper *Prevailing Wage* determination at U.S. $ 93,888 at grade 8 and higher grades ? That cap appeared unreasonable and premature because the *Prevailing Wage* determination was supposed to be an amount reflecting what a hired person would normally be paid based on that person's level of education, skills, work experience, and supervision. Further it appears that at least four (4) levels of *Prevailing Wage* were needed.

144.     8 U.S.C. § 1182 (p)(4) provides that:

"Where the Secretary of Labor uses, or makes available to employers, a governmental survey to determine the prevailing wage, such survey shall provide at least 4 levels of wages commensurate with experience, education, and the level of supervision. Where an existing government has only 2 levels, 2 intermediate levels may be created by dividing

1    by 3, the difference between the 2 levels offered, adding the quotient to the first level and

2    substracting that quotient from the second level."

3    145.    The third concern that Plaintiff expressed regarding CISCO's *Prevailing Wage*

4    determination was that CISCO would offer and pay a nonimmigrant person a *Prevailing*

5    *Wage* corresponding to a particular grade position at CISCO in order for CISCO to meet

6    U.S. Department of Labor LCA requirements to obtain authorization for that

7    nonimmigrant person to work in the U.S.. CISCO also would increase the actual wage of

8    a nonimmigrant person who had already been hired and was working at that particular

9    grade position at CISCO via a H-1B nonimmigrant visa in order for CISCO to continue

10   to conform to the U.S. Department of Labor's *Prevailing Wage* guidance for

11   nonimmigrant workers. But CISCO would not pay that *Prevailing Wage* to a U.S. person

12   working at that particular grade position at CISCO and who did not require U.S.

13   Department of Labor authorization to work in the U.S.. In some instances that *Prevailing*

14   *Wage* for that particular grade position at CISCO was higher than the actual wage that

15   CISCO paid to a U.S. person team member in Milpitas, California who was already hired

16   and had work experience in Plaintiff's team.

17   146.    Plaintiff's and Plaintiff's team's involvement with the *Prevailing Wage*

18   determination discussions at CISCO that may be controversial to Defendants, and that

19   may reveal errors or failures by Defendants, may have been combined with the pressure

20   that Mr. TENNANT exerted on CISCO to cause Defendants in themselves or via their

21   current or former directors, officers, employees, agents, assigns or affiliated companies,

22   to commit or aid, abet, counsel, command, induce the alleged violations against Plaintiff.

23   147.    On or about June 1, 2007 Plaintiff became involved with another issue at CISCO

24   whereby one of Plaintiff's team members brought up an issue to Plaintiff pertaining to

25   CISCO's acts or practices pertaining to sales of and support for GigaBit Interface

26   Converter ("*GBIC*") transceivers that can be used with CISCO routers and switches

27   products. CISCO sells high gross margin CISCO branded *GBIC* transceivers and third

28   party companies sell cheaper *GBIC* transceivers. There appears to be no rocket science

behind *GBIC* transceivers and the team member who brought up the issue to Plaintiff described a *GBIC* as "[w]hat is otherwise a commodity product in the rest of the known univers[e]" which appeared to express frustration at the issue.

148. It appears that CISCO generally discourages and obstructs the use of the cheaper third party supplied *GBIC* transceivers that could be used with CISCO routers and switches. The CISCO branded *GBIC* transceivers are apparently sold at high gross margins and the sale of the *GBIC* transceivers is reputed to be a substantial business revenue stream in itself for CISCO.

149. On information and belief, at the time that the issue was brought to Plaintiff's attention CISCO had "unsupported" or "hidden" Command Line Interface ("CLI") commands in the IOS software which could enable an end user customer to use cheaper third party supplied *GBIC* transceivers with a CISCO router or switch, but it appears that CISCO does not readily or prominently disclose those unsupported or hidden commands to end user customers in case it impacts CISCO's own business in sales of the high gross margin CISCO branded *GBIC* transceivers. It appears that CISCO only discloses those unsupported or hidden commands to enable cheaper third party *GBIC* transceivers to be used with CISCO routers and switches, as a last resort backup scenario when CISCO is faced with the prospect of losing a sales deal because a potential customer may not be able to afford to pay a proposed sales quote for CISCO products which included CISCO branded high gross margin *GBIC* transceivers. Only then would CISCO disclose those unsupported or hidden commands to that end user customer to enable the prospective customer to instead use cheaper third party *GBIC* transceivers in order for CISCO to win that sales deal with that customer. It may be arguable that this act or practice of generally discouraging and obstructing the use of cheaper third party *GBIC* transceivers with CISCO routers or switches may be unfair or deceptive acts or practices, and may be monopolistic which may be unlawful pursuant to 15 U.S.C. § 2.

150. Plaintiff escalated this issue to a Vice President at CISCO and that Vice President stated "[V]ery irritating to see us gouge our customers on this, we have to wonder what the other products make on margin to drive them to this. It has to be stopped[.]".

151. Plaintiff's and Plaintiff's team's involvement with the *GBIC* transceiver issue at CISCO that may be controversial to Defendants, and that may reveal errors or failures by Defendants, may have been combined with the pressure that Mr. TENNANT exerted on CISCO to cause Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, to commit or aid, abet, counsel, command, induce the alleged violations against Plaintiff.

152. Another instance of Plaintiff's and Plaintiff's team involvement in an issue at CISCO is where in a staff meeting consisting of Plaintiff and Plaintiff's direct reports, a software architect who is alleged to be one of the very early hired employees at CISCO and who attended Plaintiff's staff meeting insulted Plaintiff and his direct reports who were in that meeting and called them "sons of bitches". Plaintiff mentioned that issue to Plaintiff's manager.

153. On information and belief, instances of Plaintiff's and Plaintiff's team's work involvement at CISCO that may be controversial to Defendants, and that may reveal errors or failures by Defendants, may have been combined with the pressure that Mr. TENNANT exerted on CISCO to cause Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, to commit or aid, abet, counsel, command, induce the alleged violations against Plaintiff.

154. During the time period starting from February 16, 2006 through to November 7, 2007 Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies also initially started exerting subtle pressure onto Plaintiff as a result of Mr. TENNANT exerting pressure on CISCO in Mr. TENNANT's attempt to claim by force or coercion payment for alleged fee arrears against stock options held by CISCO on behalf of Plaintiff. Plaintiff tried his best to ignore the subtle pressure and maintained focus on his work assignments directing his

team and software development programs and continued to make valuable contributions to CISCO. The pressure on Plaintiff at CISCO increased as Mr. TENNANT increased his pressure on CISCO as Mr. TENNANT started to reach the end of his two-year statute of limitation period for being able to bring an attorney fee action against Plaintiff. The increased pressure on Plaintiff in the latter stages included CISCO refusing to pay Plaintiff the 2007 fiscal year-end bonus payment that was due to Plaintiff in or about September 2007.

155.     Finally, Defendants capitulated to Mr. TENNANT's pressure on CISCO when Mr. TENNANT filed the Tennant Action on August 27, 2007 in that California Trial Court. After Mr. TENNANT filed the Tennant Action, on October 3, 2007 CISCO attempted to coerce Plaintiff into signing an unconscionable mutual separation agreement, and when Plaintiff refused to sign that proposed unconscionable mutual separation agreement, on November 7, 2007 CISCO issued an unsigned letter of termination document to Plaintiff and thereafter CISCO stopped playing Plaintiff without reason or cause.

## CONCLUSION

156.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

157.     On information and belief, Plaintiff's fundamental rights, privileges or immunities under the protection of the U.S. Constitution and the laws of the U.S., and the laws of California, were violated by Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies. The alleged violations against Plaintiff started sometime after the date that Mr. TENNANT withdrew from the Divorce Action on February 15, 2006 through the date that CISCO stopped paying Plaintiff without reason or cause on or about November 7, 2007. The alleged violations against Plaintiff continued during the time period when the Tennant Action was litigated in that California Trial Court where Mr. TENNANT, a divorce attorney in the Divorce Action, pursued a fraudulent claim of breach of written contract against

Plaintiff, and during which time Plaintiff attempted to propound civil discovery on CISCO but where CISCO relentlessly stonewalled and did not produce any records, or persons to appear at hearing or trial in the Tennant Action. The alleged violations against Plaintiff further continued during the time period after the Tennant Action and on an ongoing and continuing basis, in what appears to be attempts by Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies to continue to pressure, harass and intimidate Plaintiff, and to interfere with Plaintiff's communications, and to obstruct Plaintiff from pursuing his rights, privileges or immunities under the U.S. Constitution, the laws of the U.S., and the laws of California.

158.     Amendment XIII Section 1 of the U.S. Constitution provides in pertinent part that "Neither slavery *nor involuntary servitude * * * shall exist within the United States,* or any place subject to their jurisdiction." (emphasis added). It appears that the scenario where divorce attorneys, and whoever aids them, maliciously procure and leverage any tools they can to create or fuel conflict in a contested divorce action in order to trap the divorce parties in that contested divorce action for as long as they can in order for them to pursue the divorce parties to claim by force or coercion payment of alleged fees relating to somewhat questionable divorce litigation practices, may be an example of the involuntary servitude that is unconstitutional under the U.S. Constitution.

159.     It appears that petitioning for physical child custody with 50% timeshare to each of the two parties in a divorce action with minor children is unnecessarily made prohibitive and burdensome during the divorce process in California and possibly other states in the U.S. as well. It appears that the imbalance created via physical child custody with unequal timeshare allocation mostly serves to benefit the divorce attorneys, and whoever aids them, so that they can generate and claim alleged fees for trafficking of physical child custody timeshare, rather than serve the best interests of the divorce parties' children.

160. On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies appear to have initially become caught in the crossfire where Mr. TENNANT pursued Plaintiff to attempt to enforce a fraudulent claim of alleged breach of written contract between Mr. TENNANT and Plaintiff who worked at CISCO. There was no written contract between Mr. TENNANT and Plaintiff. Mr. TENNANT pressured CISCO to attempt to claim by force or coercion payment for alleged fee arrears against stock options held by CISCO on behalf of Plaintiff. Mr. TENNANT had refused to submit to that California Trial Court the undecided matters arising from a Property Trial held on March 28 and 29, 2005 which included the issue of attorneys' fees, costs and sanctions, for adjudication by that court.

161. Plaintiff's and Plaintiff's team's involvement in work issues that may be controversial to Defendants, and that may reveal errors or failures by Defendants, may have further been combined with the pressure that Mr. TENNANT exerted on CISCO to cause Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies to commit or aid, abet, counsel, command, induce the alleged violations against Plaintiff. It appears that Defendants' eventually sided with Mr. TENNANT due to Defendants' potential exposures pertaining to the alleged potential unfair or deceptive acts or practices in or affecting commerce or labor at CISCO that Plaintiff and Plaintiff's team had questioned at CISCO. Defendants finally capitulated to Mr. TENNANT's pressure after Mr. TENNANT brought an action against Plaintiff and DOES 1 to 10 filed on August 27, 2007 in that California Trial Court.

162. One of the key exposures is where CISCO incorporates Open Source software pervasively in its derivative works and at CISCO Plaintiff had advocated compliance with the GPL licenses. If any person or entity incorporates GPL licensed software programs or libraries in their derivative works then that person or entity needs to comply with the GPL and either produce or issue a written offer to produce the accompanying source code corresponding to the derivative works that incorporated the GPL licensed

1  software programs or libraries, for the benefit of downstream software developers and

2  users. CISCO sells high gross margin products that incorporate GPL licensed software.

3  163.  It appears that Defendants' position has been that it is acceptable to continue to

4  sell, resell or sublicense derivative works that are known to be in violation of the GPL.

5  Counsel at CISCO has been known to state, pertaining to the CISCO LINKSYS GPL

6  compliance issue, "I would not let this issue hold up FCS. At a minimum, there are

7  interesting arguments against a claim of contamination; at most, someone in the

8  community would flag this as a problem , we would respectfully disagree and would

9  compromise by engineering out of our next release[.]". On information and belief,

10  CISCO does not always engineer out GPL compliance issues in the next release of a GPL

11  non-compliant derivative work from CISCO. Counsel at CISCO further stated that "[i]f

12  for the sake of argument there was some contamination risk, we d still be extremely

13  reluctant to hold up FCS, for obvious reasons * * * I think there are ways of working

14  these things out after the fact (i.e. after shipment) obviously taking some risk, but *a risk*

15  *worth taking to avoid revenue impact*[.]" (emphasis added).

16  164.  Section 4 of the GPLv2 provides in pertinent part that:

17  "You may not copy, modify, sublicense or distribute the Program

18  except as expressly provided under this License. Any attempt

19  otherwise to copy, modify, sublicense or distribute the Program is

20  void, and *will automatically terminate your rights under this License*[.]"

21  (emphasis added). It appears counsel at CISCO argued to ignore Section 4 of GPLv2.

22  165.  It appears that the GPL compliance issues may not be limited to just CISCO

23  itself, because due to the supply chain the issues may extend to upstream ODMs such as

24  BROADCOM who supply prototypes to CISCO, and the issues may also extend to

25  downstream sublicensees such as the HEWLETT-PACKARD COMPANY who

26  sublicense products from CISCO, which incorporate GPL licensed software or libraries.

27  WHEREFORE, Plaintiff presents the following Causes of the Federal Action to this Court.

28  \\

## FIRST CAUSE OF FEDERAL ACTION

### UNLAWFUL ELECTRONIC SURVEILLANCE ON PLAINTIFF'S COMMUNICATIONS, in violation of 50 U.S.C. § 1801 et seq., by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.

166.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

167.    On information and belief, sometime after February 15, 2006 Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced unlawful electronic surveillance on Plaintiff's communications, either via warrantless, or via an ex-parte Foreign Intelligence Surveillance Act ("FISA") warrant application made pursuant to 50 U.S.C. § 1801 et seq.

168.    On or about March 2, 2009 the U.S. Department of Justice released a Memorandum of the U.S. Department of Justice's Office of Legal Counsel which appears to have been written by Mr. JOHN C. YOO and dated September 25, 2001. In the Conclusion of that document it is stated "[F]or the foregoing reasons, we believe that changing FISA's requirement that "the" purpose of a FISA search be to collect foreign intelligence to "a" purpose will not violate the Constitution.". It appears that the change from "the" purpose to "a" purpose in the interpretation of FISA may have led to FISA warrant applications being used for reason(s) other than what FISA had originally been intended for. The number of FISA warrant applications appears to have grown steadily since 2001 and most of the FISA warrant applications appear to result in an order being issued by the Foreign Intelligence Surveillance Court ("FISC") to authorize electronic surveillance. Given that the FISA warrant application process is not open to the public, it is not publicly known which specific minimization procedures, for example whether citizenship and residency checks, are conducted prior to a FISA warrant application.

169.    On information and belief, in the Divorce Action Mr. BOUMAN, a divorce attorney, maliciously procured a CLETS TRO against Plaintiff by negatively stereotyping

PILLAY v. CISCO SYSTEMS, INC. et alia    **COMPLAINT**    Page 51

Plaintiff's country of national origin and as a result alleging Plaintiff was a flight risk, "a purpose" of which was a ruse to peg down the petitioner's side of the scales in favor of the petitioner and unfavorably against the Plaintiff/respondent at the start of the Divorce Action.

170.     On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies likewise committed or aided, abetted, counseled, commanded, induced either via warrantless or via malicious procurement of a FISA warrant application and resulting FISC court order to authorize unlawful electronic surveillance on Plaintiff's communications "a purpose" of which was as a tool to pressure, harass and intimidate Plaintiff and obstruct Plaintiff from pursuing his rights, privileges and immunities under the U.S. Constitution, the laws of the U.S., and the laws of California, while Mr. TENNANT, a divorce attorney, pressured CISCO to attempt to collect by force or coercion payment for alleged attorney fee arrears against stock options held by CISCO on behalf of Plaintiff. Mr. TENNANT via the Tennant Action attempted to enforce a fraudulent alleged claim of breach of written contract between Mr. TENNANT and Plaintiff, against Plaintiff. There was no written contract between Mr. TENNANT and Plaintiff.

171.     Given that Plaintiff is a U.S. person inside the U.S. any electronic surveillance, either via warrantless or via a warrant application and resulting FISC court order maliciously procured under 50 U.S.C. § 1801 et seq. (FISA) on Plaintiff's communications, would be unlawful.

172.     On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies committed or aided, abetted, counseled, commanded, induced justification for unlawful electronic surveillance on Plaintiff's communications by leveraging the fact of Plaintiff's national origin being outside the U.S. and Plaintiff's ongoing contact with friends and family outside the U.S., unaware that Plaintiff had naturalized as a U.S. citizen in the year 2003 and Plaintiff had not informed CISCO of that fact. When Plaintiff began to work at

1    CISCO in the year 1997 Plaintiff was a U.S. permanent resident alien but not a U.S.

2    citizen at that time.

3    173.      It is recorded in the Congressional Record on the 110th U.S. Congress at page

4    S891 that on February 12, 2008 U.S. Senator RUSSELL D. FEINGOLD stated "[I]

5    strongly oppose S. 2248. This bill is deeply flawed in ways that will have a direct impact

6    on the privacy of Americans. * * * Unfortunately, under intense administration pressure

7    marked by inaccurate and misleading scare tactics, the Senate has buckled. And we are

8    left with a very dangerous piece of legislation[.]" and at Page S892 it is further recorded

9    that U.S. Senator RUSSELL D. FEINGOLD stated that "[T]his legislation is particularly

10    troubling because we live in a world in which international telecommunications are

11    increasingly commonplace. * * * Millions of ordinary, and innocent, Americans

12    communicate overseas for entirely legitimate purposes and business reasons. Parents or

13    children call family members oversea[s]". That U.S. Senate S.2248 bill for the 110th U.S.

14    Congress was passed as the FISA Amendments Act of 2008 on February 12, 2008 in the

15    U.S. Senate with a 68 ayes to 29 noes vote.

16                 **SECOND CAUSE OF FEDERAL ACTION**

17   **UNREASONABLE SEARCHES ON PLAINTIFF, in violation of Amendment IV of United**

18   **States Constitution, by Defendants CISCO, Additional Defendants #1 through #21, and one**

19                              **or more DOES.**

20    174.      The allegations set forth in the preceding paragraphs are re-alleged and

21    incorporated herein by reference as if set forth fully herein.

22    175.      As a result of the alleged unlawful electronic surveillance on Plaintiff's

23    communications, Defendants in themselves or via their current or former directors,

24    officers, employees, agents, assigns or affiliated companies, committed or aided, abetted,

25    counseled, commanded, induced unreasonable searches on Plaintiff's communications in

26    violation of Amendment IV of the U.S. Constitution.

27   \\

28   \\

## THIRD CAUSE OF FEDERAL ACTION

**ABRIDGEMENT OF PLAINTIFF'S FREEDOM OF COMMUNICATIONS, in violation of Amendment I of United States Constitution, by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

176. The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

177. As a result of Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committing or aiding, abetting, counseling, commanding, inducing unreasonable searches and unlawful electronic surveillance on Plaintiff's communications, Plaintiff has been injured in right to unabridged freedom of communications.

## FOURTH CAUSE OF FEDERAL ACTION

**ABRIDGEMENT OF PLAINTIFF'S PRIVILEGES OR IMMUNITIES, in violation of Amendment XIV of United States Constitution, by Defendants one or more DOES.**

178. The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

179. On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced exploitation of the fact of Plaintiff's national origin being outside the U.S., and Plaintiff's ongoing contact with family and friends outside the U.S., to justify committing or aiding, abetting, counseling, commanding, inducing unreasonable searches and unlawful electronic surveillance on Plaintiff's communications.

\\
\\
\\
\\
\\

## FIFTH CAUSE OF FEDERAL ACTION

**DEPRIVATION OF PLAINTIFF'S RIGHTS, PRIVILIEGES OR IMMUNITIES SECURED BY THE U.S. CONSTITUTION AND LAWS OF THE U.S., in violation of 42 U.S.C. § 1983, by Defendants one or more DOES.**

180.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

181.    On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced deprivation of Plaintiff in rights, privileges or immunities secured by the U.S. Constitution and the laws of the U.S..

## SIXTH CAUSE OF FEDERAL ACTION

**CONSPIRACY TO DEPRIVE PLAINTIFF OF RIGHTS OR PRIVILEGES, in violation of 42 U.S.C. § 1985(3), by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

182.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

183.    On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced injury to Plaintiff in property by depriving Plaintiff of the ability to hold onto vested, unexercised, unexpired and "above-water" stock options, which had been granted to Plaintiff by CISCO, until the expiry dates of those stock options.

## SEVENTH CAUSE OF FEDERAL ACTION

**CONSPIRACY TO DEPRIVE PLAINTIFF OF RIGHTS OR PRIVILEGES, in violation of 42 U.S.C. § 1985(3), by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

184.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

185.     On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced injury to Plaintiff in property by depriving Plaintiff of the ability to hold onto vested, unexercised, unexpired and "under-water" stock options, which had been granted to Plaintiff by CISCO, until the expiry dates of those stock options.

## EIGTH CAUSE OF FEDERAL ACTION

**CONSPIRACY TO DEPRIVE PLAINTIFF OF RIGHTS OR PRIVILEGES, in violation of 42 U.S.C. § 1985(3), by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

186.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

187.     On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced injury to Plaintiff in property by depriving Plaintiff of the ability to continue to vest and hold stock options which had not vested and not expired yet, which had been granted to Plaintiff by CISCO, until the expiry dates of those stock options.

## NINTH CAUSE OF FEDERAL ACTION

**CONSPIRACY TO DEPRIVE PLAINTIFF OF RIGHTS OR PRIVILEGES, in violation of 42 U.S.C. § 1985(3), by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

188.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

189.     On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced injury to Plaintiff in person by depriving Plaintiff of the equal protection of the laws by obstructing Plaintiff's attempts

at propounding civil discovery on CISCO which in turn impaired Plaintiff's ability to defend himself or cross-complain in the Tennant Action.

## TENTH CAUSE OF FEDERAL ACTION

**CONSPIRACY TO DEPRIVE PLAINTIFF OF RIGHTS OR PRIVILEGES, in violation of 42 U.S.C. § 1985(3), by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

190.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

191.    On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced injury to Plaintiff in person by depriving Plaintiff of the equal protection of the laws, or of equal privileges and immunities under the laws, by committing or aiding, abetting, counseling, commanding, inducing unreasonable searches and unlawful electronic surveillance on Plaintiff's communications.

## ELEVENTH CAUSE OF FEDERAL ACTION

**NEGELCT TO PREVENT DEPRIVATION OF PLAINTIFF IN RIGHTS OR PRIVILEGES, in violation of 42 U.S.C. § 1986, by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

192.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

193.    On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced neglect to prevent injury to Plaintiff in property by depriving Plaintiff of the ability to hold onto vested, unexercised, unexpired and "above-water" stock options, which had been granted to Plaintiff by CISCO, until the expiry dates of those stock options.

\\

## TWELFTH CAUSE OF FEDERAL ACTION

## NEGELCT TO PREVENT DEPRIVATION OF PLAINTIFF IN RIGHTS OR

## PRIVILEGES, in violation of 42 U.S.C. § 1986, by Defendants CISCO, Additional

## Defendants #1 through #21, and one or more DOES.

194.     The allegations set forth in the preceding paragraphs are re-alleged and
incorporated herein by reference as if set forth fully herein.

195.      On information and belief, Defendants in themselves or via their current or
former directors, officers, employees, agents, assigns or affiliated companies, committed
or aided, abetted, counseled, commanded, induced neglect to prevent injury to Plaintiff
by depriving Plaintiff of the ability to hold onto vested, unexercised, unexpired and
"under-water" stock options, which had been granted to Plaintiff by CISCO, until the
expiry dates of those stock options.

## THIRTEENTH CAUSE OF FEDERAL ACTION

## NEGELCT TO PREVENT DEPRIVATION OF PLAINTIFF IN RIGHTS OR

## PRIVILEGES, in violation of 42 U.S.C. § 1986, by Defendants CISCO, Additional

## Defendants #1 through #21, and one or more DOES.

196.     The allegations set forth in the preceding paragraphs are re-alleged and
incorporated herein by reference as if set forth fully herein.

197.      On information and belief, Defendants in themselves or via their current or
former directors, officers, employees, agents, assigns or affiliated companies, committed
or aided, abetted, counseled, commanded, induced neglect to prevent injury to Plaintiff
by depriving Plaintiff of the ability to continue to vest and hold stock options which had
not vested and not expired yet, which had been granted to Plaintiff by CISCO, until the
expiry dates of those stock options.

\\
\\
\\
\\

1

**FOURTEENTH CAUSE OF FEDERAL ACTION**

2

**NEGELCT TO PREVENT DEPRIVATION OF PLAINTIFF IN RIGHTS OR**

3

**PRIVILEGES, in violation of 42 U.S.C. § 1986, by Defendants CISCO, Additional**

4

**Defendants #1 through #21, and one or more DOES.**

5

198.     The allegations set forth in the preceding paragraphs are re-alleged and

6

incorporated herein by reference as if set forth fully herein.

7

199.     On information and belief, Defendants in themselves or via their current or

8

former directors, officers, employees, agents, assigns or affiliated companies, committed

9

or aided, abetted, counseled, commanded, induced neglect to prevent injury to Plaintiff

10

by depriving Plaintiff of the equal protection of the laws by obstructing Plaintiff's

11

attempts at propounding civil discovery on CISCO which in turn impaired Plaintiff's

12

ability to defend himself or cross-complain in the Tennant Action.

13

**FIFTEENTH CAUSE OF FEDERAL ACTION**

14

**NEGELCT TO PREVENT DEPRIVATION OF PLAINTIFF IN RIGHTS OR**

15

**PRIVILEGES, in violation of 42 U.S.C. § 1986, by Defendants CISCO, Additional**

16

**Defendants #1 through #21, and one or more DOES.**

17

200.     The allegations set forth in the preceding paragraphs are re-alleged and

18

incorporated herein by reference as if set forth fully herein.

19

201.     On information and belief, Defendants in themselves or via their current or

20

former directors, officers, employees, agents, assigns or affiliated companies, committed

21

or aided, abetted, counseled, commanded, induced injury to Plaintiff in person by neglect

22

to prevent deprivation of Plaintiff in the equal protection of the laws, or of equal

23

privileges and immunities under the laws, by committing or aiding, abetting, counseling,

24

commanding, inducing unreasonable searches and unlawful electronic surveillance on

25

Plaintiff's communications.

26

\\

27

\\

28

\\

**SIXTEENTH CAUSE OF FEDERAL ACTION**

**UNLAWFUL INTERCEPTION AND DISCLOSURE OF PLAINTIFF'S INFORMATION AND RECORDS PERTAINING TO WIRE, ORAL OR ELECTRONIC COMMUNICATIONS, in violation of 18 U.S.C. § 2511 and whereby civil relief permissible via 18 U.S.C. § 2520, by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

202.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

203.    On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced injury to Plaintiff in person by unlawful interception and disclosure of Plaintiff's information and records pertaining to Plaintiff's wire, oral or electronic communications.

**SEVENTEENTH CAUSE OF FEDERAL ACTION**

**UNLAWFUL DISCLOSURE OF PLAINTIFF'S INFORMATION AND RECORDS PERTAINING TO WIRE OR ELECTRONIC COMMUNICATIONS, in violation of 18 U.S.C. § 2703 and whereby civil relief permissible via 18 U.S.C. § 2707, by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

204.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

205.    On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced injury to Plaintiff in person by unlawful disclosure of Plaintiff's information and records pertaining to Plaintiff's wire or electronic communications.

\\

\\

\\

---

## EIGHTEENTH CAUSE OF FEDERAL ACTION

**UNFAIR COMPETITION via INFRINGEMENT OF COPYRIGHT AND PUBLIC LICENSE, under the jurisdiction of 28 U.S.C. § 1338(b), by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES**

206.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

207.     28 U.S.C. § 1338(b) provides that "[T]he district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright * * * law[s].". The GPLv2 license is categorized as a "Public" license and Plaintiff is a public user of GPLv2 licensed software. The FSF-CISCO Action in the USDC SDNY case number 1:08-CV-10764-PGG alleged infringement of copyright pursuant to 17 U.S.C. § 501 et seq..

208.     On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced violations of the GPL licenses in derivative works sold by CISCO that incorporated GPL licensed software programs or libraries. As a result of the violations of the GPL licenses, downstream software developers and users of software licensed under the GPL licenses have been deprived in the ability to incorporate or use any and all undisclosed source code corresponding to those derivative works sold by CISCO that incorporated GPL licensed software programs or libraries.

209.     If it pleases this Court, Plaintiff requests this Court to review and adjudicate on whether the violations of the GPL licenses and non-offer or non-production of source code corresponding to the derivative works sold by CISCO that incorporate GPL licensed software programs or libraries may have been unfair or deceptive acts or practices in or affecting commerce which may be unlawful under the laws of the U.S..

210.     In the alternative, if it pleases this Court Plaintiff requests this Court to refer this Cause of Federal Action to the U.S. Federal Trade Commission which may have

jurisdiction for this Cause of Federal Action pursuant to 15 U.S.C. § 45 (Unfair methods of competition unlawful; prevention by Commission), for review and action by that Commission.

211.     If it pleases this Court, this potential Cause of Federal Action could be further split into individual causes of action corresponding to each and every derivative work sold by CISCO which incorporate GPL licensed software programs or libraries and that are in violation the GPL licenses.

### NINETEENTH CAUSE OF FEDERAL ACTION

**UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN OR AFFECTING COMMERCE, in potential violation of 15 U.S.C. § 45, by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

212.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

213.     On information and belief, Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced obstruction of use of cheaper GBIC transceivers sold by third party entities, and did not disclose to customers hidden or unsupported commands that could be executed from the IOS software to enable customers to use cheaper third party GBIC transceivers, and instead promoted the sale of only CISCO branded high gross margin GBIC transceivers, that can be used with CISCO routers and switches products.

214.     If it pleases this Court, Plaintiff requests this Court to review and adjudicate whether the obstruction of use of cheaper third-party GBIC transceivers and the non-disclosure of hidden or unsupported commands which enable the use of cheaper third party GBIC transceivers that can be used with CISCO routers and switches products, may have been unfair or deceptive acts or practices in or affecting commerce which may be unlawful under the laws of the U.S..

215.     In the alternative, if it pleases this Court Plaintiff requests this Court to refer this Cause of Federal Action to the U.S. Federal Trade Commission which may have jurisdiction for this Cause of Federal Action pursuant to 15 U.S.C. § 45 (Unfair methods of competition unlawful; prevention by Commission), for review and action by that Commission.

### TWENTIETH CAUSE OF FEDERAL ACTION

**UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN OR AFFECTING LABOR, in violation of 8 U.S.C. § 1182(p)(4), by Defendants CISCO, Additional Defendants #1 through #21, and one or more DOES.**

216.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth fully herein.

217.     On or about February 5, 2007 Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced violation of 8 U.S.C. § 1182(p)(4) by not providing at least four (4) levels of wages for determination of the prevailing wages at CISCO.

218.     On or about February 5, 2007 Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies, committed or aided, abetted, counseled, commanded, induced payment of a prevailing wage level to a nonimmigrant non-U.S. person at CISCO, who required a U.S. H-1B nonimmigrant work visa in order to work in the U.S., which was higher in amount than the actual wage level paid to an existing hired and on-the-job U.S. permanent resident alien or U.S. citizen person employed at CISCO who was at the same grade and with similar or greater experience and qualifications as compared to the nonimmigrant non-U.S. person. That practice appears unfair.

219.     If it pleases this Court, Plaintiff requests this Court to review and adjudicate on whether Defendants in themselves or via their current or former directors, officers, employees, agents, assigns or affiliated companies determining of the prevailing wage

1    levels for CISCO may have been unfair or deceptive acts or practices in or affecting labor

2    which may be unlawful under the laws of the U.S..

3    220.     In the alternative, if it pleases this Court Plaintiff requests this Court to refer this

4    Cause of Federal Action to the U.S. Secretary of Labor, for review and action by that

5    Secretary.

6                         **TWENTY-FIRST CAUSE OF FEDERAL ACTION**

7    **RETALIATION AGAINST PLAINTIFF BY A PUBLICLY TRADED COMPANY, in**

8    **violation of potentially 18 U.S.C. § 1343 or other Federal law whereby civil relief**

9    **permissible via 18 U.S.C. § 1514A (a)(1)(C) and (a)(2), against Defendants CISCO,**

10   **Additional Defendants #1 through #21, and one or more DOES.**

11   221.     The allegations set forth in the preceding paragraphs are re-alleged and

12   incorporated herein by reference as if set forth fully herein.

13   222.     On information and belief, Defendants in themselves or via their current or

14   former directors, officers, employees, agents, assigns or affiliated companies, committed

15   or aided, abetted, counseled, commanded, induced retaliation against Plaintiff because of

16   Plaintiff's and Plaintiff's team's involvement or assistance or investigation or escalation

17   in the potentially unfair or deceptive acts or practices in or affecting commerce or labor at

18   CISCO which may be controversial to Defendants.

19   \\

20   \\

21   \\

22   \\

23   \\

24   \\

25   \\

26   \\

27   \\

28   \\

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment on the following relief:

1.  In favor of Plaintiff and against Defendants CISCO, Additional Defendants #1 through #21, and DOES 1 through 100, and as applicable to each of them as individual persons or individual entities, and due to the THIRD, SIXTH, SEVENTH, EIGTH, NINTH, TENTH, ELEVENTH, TWELFTH, THIRTEENTH, FOURTEENTH, FIFTEENTH and TWENTY-FIRST CAUSES OF FEDERAL ACTION, Plaintiff prays for:

    a.  Compensatory damages as appropriate under the laws of the U.S..

    b.  Punitive damages as appropriate under the laws of the U.S..

2.  In favor of Plaintiff and against Defendants CISCO, Additional Defendants #1 through #21, and DOES 1 through 100, and as applicable to each of them as individual persons or individual entities, and due to the FIRST, SECOND, SIXTEENTH and SEVENTEENTH CAUSES OF FEDERAL ACTION, Plaintiff prays for:

    a.  Compensatory damages as appropriate under the laws of the U.S..

    b.  Punitive damages as appropriate under the laws of the U.S..

    c.  The Court to order Defendants to cease and desist from the alleged unlawful acts, practices or violations against Plaintiff.

    d.  The Court to order Defendants to cease and desist from using any and all information or records obtained via the alleged unlawful acts, practices or violations against Plaintiff.

    e.  The Court to order Defendants to produce to Plaintiff any and all information or records obtained via the alleged unlawful acts, practices or violations against Plaintiff.

3.  Against Defendants one or more DOES, and as applicable to each of them as individual persons or individual entities, and due to the FOURTH and FIFTH CAUSES OF FEDERAL ACTION, Plaintiff prays for:

a. Such relief as the Court may deem just and proper.

4. Against Defendants CISCO, Additional Defendants #1 through #21, and DOES 1 through 100, and as applicable to each of them as individual persons or individual entities, and due to the EIGHTEENTH CAUSE OF FEDERAL ACTION, Plaintiff prays for:

    a. If this Court has the jurisdiction, the Court to order that a certificate shall issue with each and every software release made by Defendants which incorporate GPL licensed software programs or libraries to certify that those software releases do not contain any violations or infringement of the GPL licenses.

    b. If this Court has the jurisdiction, the Court to issue an Amendment to GPLv2 to:

        i. strike out completely Section 3(b) from the GPLv2

        ii. amend Section 3(a) of the GPLv2 to direct that the internet become the preferred medium for downloading, via the http or ftp or other protocols, source code corresponding to derivative works that incorporate GPLv2 licensed programs or libraries.

    c. In the alternative, the Court to refer that matter to the U.S. Federal Trade Commission for review and action as appropriate by that Commission.

5. Against Defendants CISCO, Additional Defendants #1 through #21, and DOES 1 through 100, and as applicable to each of them as individual persons or individual entities, and due to the NINETEENTH CAUSE OF FEDERAL ACTION, Plaintiff prays for:

    a. If the Court has the jurisdiction, the Court to review and adjudicate if the GBIC issue was unlawful, and if so for such relief as the Court may deem just and proper.

    b. In the alternative, the Court to refer that matter to the U.S. Federal Trade Commission for review and action as appropriate by that Commission.

6. Against Defendants CISCO, Additional Defendants #1 through #21, and DOES 1 through 100, and as applicable to each of them as individual persons or individual entities, and due to the TWENTIETH CAUSE OF FEDERAL ACTION, Plaintiff prays for:

    a. If the Court has the jurisdiction, the Court to review and adjudicate if the Prevailing Wage determination issue was unlawful, and if so for such relief as the Court may deem just and proper.

    b. In the alternative, the Court to refer that matter to the Secretary of the U.S. Department of Labor for review and action as appropriate by that Secretary.

7. Against all Defendants, and as applicable to each of them as individual persons or individual entities, and due to all the CAUSES OF FEDERAL ACTION, Plaintiff prays for:

    a. Costs of suit, and applicable fees if any, incurred by Plaintiff.

    b. Such other and further relief in favor of Plaintiff and against Defendants as the Court may deem just and proper.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES.

Date: May 20, 2009

Respectfully submitted by:

KENNETH DEREK ANTHONY PILLAY
Plaintiff

---

PILLAY v. CISCO SYSTEMS, INC. et alia     **COMPLAINT**                  Page 67

Pillay v. Cisco Systems Inc. et alia    U.S.D.C. Northern District of California  CIVIL Action No.:

## ADDITIONAL DEFENDANTS ATTACHMENT TO COMPLAINT

**Additional Defendants:**
**Cisco Systems Inc. ("Cisco") Executive Officers:**

```
1. SUSAN L. BOSTROM                        ("BORSTROM")
2. FRANK A. CALDERONI                      ("CALDERONI")
3. LARRY R. CARTER                         ("CARTER")
4. JONATHAN CHADWICK                       ("CHADWICK")
5. JOHN T. CHAMBERS                        ("CHAMBERS")
6. MARK CHANDLER                           ("CHANDLER")
7. WIM ELFRINK                             ("ELFRINK")
8. RICHARD J. JUSTICE                      ("JUSTICE")
9. RANDY POND                              ("POND")
```

**Cisco Board of Directors (excluding directors of the board of directors of Cisco who are also executive officers of Cisco):**

```
10.    CAROL A. BARTZ                      ("BARTZ")
11.    M. MICHELE BURNS                    ("BURNS")
12.    MICHAEL D. CAPELLAS                 ("CAPELLAS")
13.    BRIAN L. HALLA                      ("HALLA")
14.    JOHN L. HENNESSEY                   ("HENNESSEY")
15.    RICHARD M. KOVACEVICH               ("KOVACEVICH")
16.    RODERICK C. MCGEARY                 ("MCGEARY")
17.    MICHAEL K. POWELL                   ("POWELL")
18.    STEVEN M. WEST                      ("WEST")
19.    JERRY YANG                          ("YANG")
```

**Other relevant entities or affiliated companies of Cisco:**

```
20.    CISCO TECHNOLOGY, INC.           CA Corp. # C2030041
21.    CISCO SYSTEMS HOLDINGS I, INC.   CA Corp. # C2575690
```